NATIONAL AUTO BROKERS CORP. et al., Plaintiffs,

v.

GENERAL MOTORS CORPORATION et al., Defendants.

AMBOOK ENTERPRISES, Plaintiff,

v.

TIME INCORPORATED et al., Defendants.

TIMES SQUARE ASSOCIATES and Ira Jay Sands, Plaintiffs,

v.

NEW YORK TIMES COMPANY et al., Defendants.

Nos. 70 Civ. 5421B, 72 Civ. 5438 and 72 Civ. 3515.

United States District Court, S. D. New York.

Aug. 3, 1973.

See also, D.C., 332 F.Supp. 280.

478

Carl E. Person, New York City, for plaintiff National Auto Brokers Corp.

R. Alan Stotsenburg, New York City (Lyman & Ash, Philadelphia, Pa., of

counsel), for plaintiff Ambook Enterprises.

Demov, Morris, Levin & Shein, New York City (Irving Bizar, New York City, of counsel), for plaintiffs Times Square Associates and Ira Jay Sands.

Cahill, Gordon & Reindel, New York City (Floyd Abrams, Allen S. Joslyn, Eric I. Harris, Charles Platto, New York City, of counsel), for defendant New York Times Co.

Townley, Updike, Carter & Rodgers, New York City (Andrew L. Hughes, New York City, of counsel), for defendants New York News Inc. and Newsday, Inc.

Patterson, Belknap & Webb, New York City (D. Robert Owen, Washington, D. C., of counsel), for defendant Dow Jones & Co., Inc.

Nixon, Hargrave, Devans & Doyle, Rochester, N. Y. (William H. Morris, New York City, of counsel), for defendant Westchester Rockland Newspapers, Inc.

Cravath, Swaine & Moore, New York City (Harold R. Medina, Jr., V. Thomas Fryman, Jr., New York City), for defendant Time Inc.

Breed, Abbott & Morgan, New York City (David S. Patterson, New York City, of counsel), for defendant J. Walter Thompson Co.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Martin Kleinbard, Cameron Clark, New York City, of counsel), for defendants Young & Rubicam International, Inc. and New York Post Corp.

Lunney, Downey & Crocco, New York City (J. Robert Lunney, New York City, of counsel), for defendant Batten, Barton, Durstine & Osborne, Inc.

Coudert Brothers, New York City (Joseph A. McManus, New York City, of counsel), for defendant Ted Bates & Co., Inc.

Donovan, Leisure, Newton & Irvine, New York City (Mahlon F. Perkins, Jr.,

William C. Pelster, New York City, of counsel), for defendant American Assn. of Advertising Agencies.

GRIESA, District Judge.

Plaintiffs in each of these related antitrust cases have filed motions for class action treatment. Time Incorporated— one of the defendants in the *Ambook* case—has filed a motion requesting the Court to deny class action treatment in that case.

Two parties—Kings Electronics Co., Inc. and Olympia Theatre Co.—have moved to intervene as plaintiffs in the *Ambook* action. Finally, there is a motion in the *Ambook* case for leave to file a second amended complaint.

The motions by the various plaintiffs in the three actions for class action treatment are denied in all respects. Time Incorporated's motion in the *Ambook* case for denial of class action treatment is granted. The motion to have Kings Electronics and Olympia Theatre intervene as plaintiffs in the *Ambook* case is granted to the extent that these parties will be permitted to present their individual claims. The motion in *Ambook* to file a second amended complaint is denied, with leave to move to replead consistently with this opinion.

### The Ambook Action

*Facts*

a. *Procedural Steps*

This action was commenced in the United States District Court for the Eastern District of Pennsylvania on June 1, 1972. In December 1972 the action was transferred to this district pursuant to 28 U.S.C. § 1404.

The amended complaint alleges that plaintiff is a Pennsylvania partnership with its principal place of business in West Hazleton, Pennsylvania, and that plaintiff "has engaged" in the retail and wholesale selling of books and other items in interstate commerce. The de-

fendants named in the amended complaint are Time Incorporated, New York Times Company, the American Association of Advertising Agencies, Inc. ("AAAA"), and four advertising agencies—J. Walter Thompson Co., Young & Rubicam International, Inc., Batten, Barton, Durstine & Osborne, Inc. and Ted Bates & Company, Inc.

The amended complaint alleges that the action is brought on behalf of all "producers, wholesalers and retailers of goods and services of interstate commerce in the United States who advertise in publications." The number in the class is estimated to be at least 1 million persons.[1]

The amended complaint alleges that defendants have combined and conspired in unlawful restraint of trade with one another and with other publishers and advertising agencies "including almost all periodical and newspaper publishers and advertising agencies in the United States." It is alleged that in furtherance of said combination and conspiracy the publisher defendants, together with other publishers, have established a dual rate structure for the sale of advertising space in their publications, under which advertising agencies obtain a 15% commission from the publishers, whereas advertisers dealing directly with the publishers obtain no such commission. It is alleged that the purpose and effect of the illegal combination and conspiracy is (a) to coerce advertisers to purchase the service of advertising agencies; (b) to prevent advertisers from establishing their own internal structure for carrying out service of the type offered by advertising agencies; and (c) to fix an unlawful price for the services offered by advertising agencies to their advertising clients equal to approximately 17.-6% of the price of advertising charged by the publishers. The amended complaint seeks injunctive relief and damages for class members in excess of $1 billion.

The attorneys of record for plaintiff Ambook were originally Richard A. Ash, Esq. and Cletus P. Lyman, Esq. of Philadelphia. On January 15, 1973, after the case had been transferred to this Court, R. Alan Stotsenburg, Esq. of New York City filed a notice of appearance as attorney of record for plaintiff. The notice requested that copies of all papers be served upon Lyman & Ash, Philadelphia counsel for plaintiff, in addition to being served on Mr. Stotsenburg.

On November 27, 1972 the parties stipulated that the time for plaintiff to make a motion for class action determination would be adjourned until 20 days subsequent to the adjudication of a motion which the New York Times had made before the Judicial Panel on Multidistrict Litigation. The Judicial Panel denied the New York Times' motion as moot on December 12, 1972. Plaintiff did not make any motion for class action determination within 20 days following this action by the Multidistrict Panel.

On February 9, 1973 Time filed a motion in this Court requesting a determination that this action may *not* be maintained as a class action.

On March 29, 1973 a conference was held with the Court regarding the scheduling of pending motions in the *Ambook* case and also in the related *National Auto Brokers* and *Times Square* cases. It was decided that the class action motions in all three cases would be heard together, prior to the hearing of any other motions in these actions. In addition, Mr. Stotsenburg, plaintiff Ambook's counsel, indicated that he would move for permission to have certain additional plaintiffs intervene in the *Ambook* action. It was decided to have the

---

1. During the course of proceedings on the class action motions, plaintiff's counsel has proposed a redefinition of the class- es sought to be represented. Such redefined classes will be discussed later in this opinion.

intervention motion heard at the same time as the class action motions.

On April 16, 1973 counsel for plaintiff in the *Ambook* action filed a notice of motion seeking the following relief:

(a) leave for Kings Electronics Co. and Olympia Theatre Co. to intervene as plaintiffs;

(b) leave to file a proposed second amended complaint; and

(c) determination that the action should be maintained as a class action.

The proposed second amended complaint is divided into four counts. All the counts are based on the same basic claim asserted in the amended complaint —*i. e.*, the claim relating to the alleged dual rate system for advertising rates charged by publications. Count 1 of the proposed second amended complaint is based on Section 1 of the Sherman Act and alleges that the dual rate system resulted from a combination and conspiracy of publishers and advertising agencies. Count 2 is based on the Robinson-Patman Act and alleges discrimination in pricing. Count 3 is based upon Section 2 of the Sherman Act and alleges monopolization and attempt to monopolize by the New York Times with respect to classified advertising in the New York metropolitan area. Each of these counts request damages. Count 4 re-alleges the same violations referred to in Counts 1, 2 and 3 and requests injunctive relief.

The proposed second amended complaint offers a revised definition of the class or classes to be represented. However, there is no utility in describing the class definitions in the proposed second amended complaint, because a further revised definition of the classes was made following a hearing held May 21, 1973, when I requested that the parties give further consideration to questions regarding the manageability of the action.

b. *Ambook Classes as Currently Proposed.*

Plaintiff now proposes two basic classes—those for whom damages are sought, and those for whom injunctive relief is sought.

The proposed class for damages in the *Ambook* action is broken down into three subclasses. One subclass includes advertisers in the publications of Time Incorporated. The other subclasses include certain limited groups of advertisers in the New York Times. In a supplemental memorandum filed June 6, 1973 plaintiff's counsel defines these subclasses as follows:

"*Time Damages Subclass* All advertisers in the publications of Time Incorporated during the period beginning January 1, 1968 to the present.

"*N.Y. Times Contract Damages Subclass* All contract advertisers in the New York Times during the period beginning January 1, 1968 to the present, excluding classified and retail advertisers.

"*N.Y. Times Motion Picture Damages Subclass* All motion picture advertisers in the New York Times during the period beginning January 1, 1968 to the present."

In a supplemental memorandum filed June 11, 1973 plaintiff's counsel defines the injunction class as follows:

"All persons and entities who have advertised or who are likely to advertise in the future in the publications of Time Incorporated and The New York Times Company."

With regard to the damage subclasses, as already described, the descriptions refer to certain categories of advertisers who have placed advertisements "beginning January 1, 1968." Presumably plaintiff's counsel is attempting to refer to the four-year statutory period for antitrust damage actions provided in 15 U.S.C. § 15. However, since the *Ambook* action was commenced June 1,

1972, the four-year period commenced June 1, 1968, not January 1, 1968. I will consider that the damage subclasses refer to the period commencing June 1, 1968.

### c. *Advertising in the New York Times.*

It is appropriate at this point to describe to some extent the categories of advertisers and types of advertising with respect to the New York Times. Among other things, this will be helpful in understanding plaintiff's class definitions which refer to "contract advertisers," "retail advertisers," etc.

There are two methods of categorizing advertising in the New York Times. One is related to the type of arrangement between the advertisers and the Times; the other is related to the nature of the advertising.

As to the types of arrangements between the Times and its advertisers— the first classification is "contract advertisers." These are advertisers who have contracts with the Times which provide discounts for volume advertising on an annual basis. As of January 1, 1973 there were about 6,700 active contracts. A second classification is "memo advertisers." These include advertisers of schools, camps, resorts, real estate, etc., who do not take out an annual contract but may qualify for volume discounts for a number of insertions within a given period. As of January 1, 1973 there were about 3,000 active memo advertisers.

About 75% of contract and memo advertisers deal through advertising agencies; about 25% of such advertisers deal directly with the Times.

Another category of Times advertisers can be called "non-contract agency advertisers." During the month of March 1973 there were about 7,500 non-contract agency advertisers.

A further category relates to obituaries placed through funeral homes. In March 1973 there were 2,500 obituaries.

Finally, there are the advertisers which the Times terms "transients." The Times estimates that in the year 1972 there were 200,000 transient advertisers placing advertisements by mail or telephone, and an additional 36,000 who placed ads in person.

The obituaries and the transient advertisements do not involve the use of advertising agencies.

I mentioned above that there is a second method of categorizing advertising in the New York Times. This is related to the nature of the advertising. In this connection, the Times has three basic types of advertising—(1) national or general, (2) retail, and (3) classified.

National or general advertising includes advertisements of airlines, theaters, book publishers, bookclubs, banks, clothing manufacturers, real estate developers, resorts, etc. National or general advertising also includes financial items such as the "tombstone" advertisements of investment bankers.

Retail advertising includes advertisements of local department stores and specialty stores.

Classified advertising is broken into two sub-categories—"classified display" and "classified agate." Classified display involves a rather free-form kind of presentation, which may include pictorial representations. Classified agate advertising is set in specific type faces and set on a prescribed line basis.

About 70% of contract advertisers are classified advertisers, the other 30% being general or retail advertisers. Memo advertising is entirely classified. For the non-contract agency advertisers —approximately 85% are classified, mainly help wanted, real estate, and business opportunities. The obituaries are considered classified advertising. The vast majority of transient advertisements are classified.

Almost all of the national or general advertising is placed through advertising agencies. On the other hand, most of the retail advertising is submitted directly rather than through agencies. In the classified area, more than 90% of the classified display advertising is placed through agencies, and approximately 25% of the classified agate advertising is through agencies.

It would be safe to say that for the four-year period June 1, 1968—June 1, 1972, the *total* number of advertisers in the New York Times would amount to about 1,000,000. Over 900,000 of these (4 x 236,000=944,000) would be transient classified advertisers. These advertisers, together with the advertisers from the other categories—contract, memo, non-contract agency, obituaries—would bring the total to about 1,000,000.

I return now to the proposed classes and subclasses in the *Ambook* action. The first subclass for damage claims against the Times is proposed to include all contract advertisers for the four-year period, excluding classified and retail advertisers. This proposed subclass would obviously include mainly large advertisers—airlines, banks, etc.—dealing through agencies. On the basis of figures supplied by the Times, plaintiff estimates that the number in this subclass is about 3,000, and I find this estimate to be reasonable.

The second proposed subclass of damage claimants against the Times consists of all motion picture advertisers during the four-year period. Such advertisers would appear to come within the category of national or general advertisers. The proposed intervenor Olympia falls within this subclass. Olympia places advertising through an agency. Presumably most of this subclass does likewise. It is estimated that this subclass numbers about 500, and I have no reason to doubt this estimate.

### d. *Advertising in Time Incorporated Publications*

Time Incorporated's publications, in existence during all or part of the four-year period consist of Time Magazine, Life Magazine, Sports Illustrated, Fortune and Money.

Plaintiff and the proposed intervenors in the *Ambook* action seek to represent, for damage claims, all the advertisers in the publications of Time Incorporated during the four-year period. Time states that a conservative estimate of such advertisers is 2,000, and a more realistic estimate is 5,000. For the purpose of this motion, I will consider that the number is 2,000.

### e. *Number of Persons in Proposed Ambook Classes*

On the basis of the figures described above, I will consider that the number of persons in the three damage subclasses total about 5,500. This results from the figures of 3,000 and 500 for the New York Times subclasses and 2,000 for the Time Incorporated subclass.

As far as the proposed class for injunctive relief is concerned, the definition of this class is quite open-ended, involving all persons who have advertised or are likely to advertise in the future in the publications of Time Incorporated and in the New York Times. As already indicated, the total number of advertisers in the New York Times over the four-year statutory period amounts to about 1,000,000. The total number of advertisers in the publications of Time Incorporated for the same period amounts to a few thousand. It must be assumed that the class of persons involved in the claim for injunctive relief would equal several hundred thousand.

### f. *Plaintiff Ambook and Proposed Intervenors*

The proposed second amended complaint, submitted with the motion filed

April 16, 1973, alleges that Ambook Enterprises, also known as American Book Club (Ambook), is a Pennsylvania partnership with its principal place of business in West Hazleton, Pennsylvania. The proposed complaint alleges that Ambook is engaged in the selling of books, records and other consumer products.

It now appears, from affidavits submitted by Ambook and from other materials in the record, that Ambook has been out of business since at least mid-1972 and is in the process of liquidation. It no longer has a place of business.

It appears further that the Ambook partnership consists of two corporate partners—L-Club Corp. and American Book Club. L-Club Corp. is owned by eight persons connected with Loeb, Rhoades & Co.

American Book Club is owned by three shareholders, one of whom is Cletus P. Lyman, Esq., one of the attorneys for plaintiffs in this action. An affidavit filed on behalf of L-Club Corp. states that the instant lawsuit has not been authorized by L-Club Corp.

It appears that Ambook, while in business, advertised in both Time Magazine and the New York Times. Ambook claims that it spent about $35,000 for New York Times advertising and $40,000 for Time Magazine advertising. Numerous complaints were received by both publications to the effect that Ambook was accepting membership fees and then failing to carry out its commitments. As a result of the complaints, the New York Times refused to take any more advertisements regarding Ambook's club plan after January 1969, although apparently it took certain ordinary ads for the sale of books.

There was a Federal Trade Commission proceeding against Ambook for misrepresentation, resulting in a consent decree in 1971.

In the spring of 1972 Ambook made certain proposals that Time Incorporated invest in Ambook. The last of these was turned down on May 19, 1972. The present action was brought 13 days later.

There is no indication that Ambook has ever dealt with any of the advertising agencies named as defendants in its action. During the time it was in business, Ambook dealt with three other advertising agencies, one of whom was Schiff/Brown & Co., Inc. Schiff/Brown has sued Ambook in New York Supreme Court for non-payment of $51,681.90 due for advertising services. The court in that action ordered the answer of Ambook stricken, and judgment was entered for Schiff/Brown in December 1972. Ambook brought a motion to reargue, which was denied in April 1973 without prejudice to a motion to vacate the judgment. There is no indication of Ambook taking any further steps in the case.

The proposed intervenor Olympia Theatre Co. is alleged to be a New York partnership, operating a movie theater at 2770 Broadway, New York City. An affidavit has been submitted in this action on behalf of Olympia by one David Dretzin, who states that he is a principal of Olympia. Mr. Dretzin is the attorney for Ambook in the state court action brought by Schiff/Brown.

Olympia claims that it placed advertising in the New York Times through an advertising agency. The name of the agency is not given, but it is not one of the agencies who are defendants in the action. The proposed second amended complaint asserts that Olympia incurred "excessive" advertising expenditures with the New York Times of at least $900. There is no indication that Olympia has advertised in any publication of Time Incorporated.

The proposed intervenor Kings Electronics Co. is alleged to be a New York corporation, who placed advertising in the New York Times during the years 1968–1972 for the total amount of $1,725. Kings alleges that, except for one advertisement placed through an agency, it placed its advertisements di-

rectly with the Times rather than through an agency. Kings complains that it does not receive a 15% discount. There is no indication that Kings has ever advertised in any publication of Time Incorporated.

It appears that Mr. Stotsenburg, one of the attorneys for Ambook in this action, is an attorney for certain persons connected with Kings Electronics.

### g. *Relationships of Publications, Agencies and Advertisers*

In 1955 the Government brought a civil antitrust action in this court against AAAA and certain publishers' trade associations. The complaint alleged conspiracies involving these associations, designed to fix a 15% commission or discount granted by publishers to agencies and designed to prevent agencies from rebating to advertisers the commissions or discounts which the agencies obtained from the publishers. The Government further alleged that the conspirators were seeking to prevent advertisers from developing their own advertising capabilities and dealing directly with the publishers. It was alleged that this conspiracy had been going on since about 1917.

In April and May 1956 a series of consent judgments were entered against AAAA and most of the other defendants, enjoining the abuses alleged in the complaint.

The consent judgments did not prohibit publishers from granting a 15% discount to agencies. Nor did the judgments prevent advertising agencies from using the 15% discount as the compensation to be paid by their advertiser clients.

The defendants in the present action have put into the record on these motions evidence to indicate compliance with the consent judgments and to indicate the lack of uniformity in the arrangements involving publications, advertising agencies and advertisers.

These facts, of course, go to the ultimate merits of the cases; and no decision as to the merits can be made on the present motions. But the evidence submitted by defendants is important for the purpose of the motions as indicating the contentions which defendants would make at trial and the nature of the issues to be tried.

The New York Times concedes that a 15% discount or commission is granted to advertising agencies with respect to national or general advertisements and classified advertisements. But the Times asserts that it does not intrude upon the fee arrangements between advertising agencies and their advertising clients, or take any steps to prevent the agencies from passing on all or part of the discount to the clients.

The Times grants no agency discount with respect to retail advertising. It appears that most retail advertising is simply not placed through agencies.

The Times contends that its policy regarding recognition of advertising agencies is not such as to "coerce" advertisers into dealing with the alleged conspirator agencies. The Times asserts that its attitude regarding recognition of agencies has gone through an evolution over the last several years. For instance, for some time prior to 1970, according to the Times, it did not recognize an agency unless the agency had three or more clients. Commencing in 1970 the three-client requirement was dropped, and the Times will now recognize, and grant the 15% discount to, agencies representing one client only. Such agencies are apparently a device used by advertisers who have the volume of advertising and the resources which make it feasible for them to do their own advertising work. The Times asserts that at present it will recognize any agency which has the requisite credit standing and ability to perform advertising service. The Times lists 35 single-client agencies it presently recognizes.

Time Incorporated also grants a 15% discount to agencies but has grown increasingly liberal in its definition of what constitutes an agency. According to Time, since 1964 it has recognized, and granted the 15% discount to, any agency, including a "house agency," capable of performing the task of preparing advertisements. Time lists 18 house agencies presently recognized. In some cases these are subsidiaries of the advertisers; in some cases they are simply divisions.

Time asserts that it has nothing to do with the compensation arrangements between the agencies and the advertisers. According to Time, it recognizes numerous agencies who are well known to have a variety of fee arrangements other than the one complained about in this action, where the agency takes the 15% discount as its compensation.

The record on these motions contains a considerable body of evidence describing the various compensation arrangements between advertising agencies and their clients. A published study of AAAA asserts that during 1970–71 only 16% of a group of 241 agencies surveyed used media commissions as the sole basis for compensation from their clients. This study states that out of 8,632 advertising accounts surveyed, only 1.5% used media commissions as the sole basis for compensation.

A variety of other forms of compensation in use have been described. These include a flat annual or monthly fee; a flat annual or monthly fee plus commissions allowed by media; agency cost plus a negotiated profit percentage; various types of arrangements based upon performance of the advertised product.

J. Walter Thompson Co. states that it negotiates compensation arrangements individually client by client in light of the particular needs of the individual client, and that a substantial number of Thompson's clients use a compensation method other than media commissions.

Young & Rubicam states that the media commission method has been on the wane for at least ten years and that since 1970 more than ⅔ of that agency's new accounts have agreed to compensation arrangements other than media commissions. Batten, Barton, Durstine & Osborne states that for the year 1972, 33.6% of its domestic revenues came from compensation arrangements other than the media commission system. This agency asserts that the method of compensation depends on the individual needs and desires of each client. Ted Bates & Co. states that the compensation arrangement depends upon the products or services to be advertised, the size of the client's budget, the form and quantity of advertising materials required to be produced, the form of media to be used, the cost of servicing the account, etc.

*Inappropriateness of Class Action Treatment in Ambook Case*

I conclude that the requirements of Rule 23 are not met in the *Ambook* action, and that it should not be permitted to proceed as a class action.

a. *Claims of Proposed Representatives Not Typical, and Representation Inadequate*

Rule 23(a) requires that the claims of the representative parties must be typical of the claims of the class and also requires that the representative parties must be such as to fairly and adequately protect the interests of the class. These requirements are not met by plaintiff Ambook or by either of the proposed intervenors.

 Under the new Rule 23, and particularly because of the res judicata effects of judgments under the rule, a court must carefully scrutinize the adequacy of representation in all class actions. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 562 (2d Cir. 1968). In general, the primary criterion is the forthrightness and vigor with which the rep-

resentative party can be expected to assert the interests of the members of the class. *Mersay v. First Republic Corp.,* 43 F.R.D. 465 (S.D.N.Y.1968); 3B Moore's Federal Practice ¶ 23.07 at p. 23–360 (2d ed. 1969).

█ In view of the circumstances shown by the present record, Ambook does not qualify. Ambook is out of business and in the process of liquidating. One of the two partners in Ambook disclaims authorizing this action. The indications are that Ambook was in serious difficulties with its business as a result of misrepresentations in its advertising. Moreover, Ambook commenced this action against Time Incorporated only after it had failed to receive a capital investment from that company. Ambook has recently suffered what amounts to a default judgment to be entered against it in the state court action by Schiff/Brown. There is no assurance that Ambook is in a position to carry on class litigation in this Court in a responsible and vigorous manner. The indications are strongly to the contrary.

█ As far as the damage classes are concerned, Ambook apparently claims to represent both the Time Incorporated damages class and the New York Times contract damages subclass. Neither Kings nor Olympia claims to fall within these classes and cannot, of course, represent them, since membership in a class is required in order to qualify as a representative. 3B Moore's Federal Practice ¶ 23.04 at p. 23–254 (2d ed. 1969).

Ambook's attorney stated at oral argument that Ambook is a contract advertiser with the New York Times (Minutes of June 12, 1973 pp. 25–26). However, I have considerable doubt about Ambook's status as a contract advertiser. There is no affidavit giving any of the details of the contract or contracts. Moreover, Ambook was suspended from advertising its book club plan in the Times after January 1969. Although Ambook says that thereafter it

placed some ads for specific books, the facts about the arrangements with the Times for such ads have not been described.

Even if I were to hold (which I do not) that Ambook could represent damage claimants with respect to past advertising, I certainly could not permit Ambook to represent the "injunction class." Ambook is out of business, and it is unlikely that Ambook can make a showing of need for, or entitlement to, injunctive relief regarding future conduct by defendants.

█ I also hold that neither Kings nor Olympia should be permitted to represent classes or subclasses in this action. Their proposed entry into the action indicates strongly that they were brought in by Ambook and its attorneys as an artificial device to keep the class action going, after it became apparent that Ambook itself was likely to fail as a representative.

The move to have Kings and Olympia intervene came only after Time Incorporated had filed its motion to deny class action treatment, and had pointed out the claims of false advertising relating to Ambook, Ambook's poor financial condition, and Ambook's attempt to obtain financing from Time.

At this juncture, intervenors were sought who would not have Ambook's infirmities. As indicated earlier, an attorney for Ambook in the state court action is one of the principals in Olympia. Mr. Stotsenburg, one of the lawyers for Ambook in this case, is an attorney for certain people connected with Kings. Mr. Stotsenburg, in his affidavit of April 16, 1973, states that the proposal to have Kings and Olympia intervene stems from the fact that defenses may be available as against Ambook.

The record does not indicate to me that either Kings or Olympia has exercised any initiative, or shown any independent interest, in asserting claims of the kind involved in this action. Their

488

financial stake is minimal. There is no assurance whatever that either of these parties would act as responsible or forceful class representatives.

Even if I did not make the above findings against Kings and Olympia, nevertheless their utility in this action would be small. Kings is not a member of either of the New York Times damage subclasses, although Olympia is a member of (and obviously the reason for creating) the New York Times motion picture damage subclass.

Neither Kings nor Olympia has ever advertised in any publication of Time Incorporated, nor is there any evidence in the record of a desire by either to do so in the future.

It is obvious that neither Kings nor Olympia can represent the proposed "Time Damages Subclass."

As to the injunction claims, the currently proposed definition of the class is—all persons and entities who have or are likely to advertise in the publications of Time Incorporated and The New York Times Company. Neither Kings nor Olympia has or is likely to advertise in a publication of Time Incorporated. Clearly, I could not permit Kings or Olympia to act as representative of injunction claims against Time Incorporated. Perhaps the injunction class could be broken down into subclasses—those seeking injunctive relief against Time Incorporated, and those seeking injunctive relief against the New York Times. But plaintiff's attorneys, although they have done a considerable amount in the way of carving out subclasses, have not proposed *this* breakdown. I see no utility in doing so on my own motion, particularly since I have concluded in any event that neither Kings nor Olympia would be a proper representative of any of the class claims in this action.

■ Even if I were to find that Ambook and the proposed intervenors were adequate representatives, I would be constrained to hold that their claims are not typical of the claims, or legal positions, of substantial numbers of the parties sought to be represented.

One of the basic claims asserted in this action is that the advertisers in the proposed classes have been coerced into dealing with advertising agencies and prevented from establishing "in-house" advertising organizations.

But the New York Times has provided a list of 35 of its advertisers who, according to the Times, *have* set up house agencies, which are recognized by the Times and are given the 15% discount. Time Incorporated has provided a list of 18 of its advertisers who deal through house agencies and receive the 15% discount. I have no reason to doubt the veracity of this evidence.

It appears to me that the type of claim sought to be asserted by Ambook, Olympia and Kings—regarding advertisers being *prevented* from setting up in-house advertising organizations—simply does not relate to those advertisers who *have* set up such organizations. Yet such advertisers are included in all of the proposed classes except the N.Y. Times motion picture damages subclass.

Another basic claim in the *Ambook* complaint is that the alleged conspiracy has resulted in a fixed and uniform compensation paid by advertisers to the agencies equal to the discount granted by the publishers to the agencies. Both Ambook and Olympia allege that their agencies have charged on this basis. Of course, Ambook and Olympia never dealt with the agencies who are defendants in this action.

But the evidence is conclusive that there are substantial numbers of advertisers in the New York Times and Time Incorporated publications (included in all the proposed classes) who are *not* charged on this basis. There are a substantial number of advertiser clients of the four agency defendants who are *not* charged on this basis.

Whatever claims these other advertisers may have, it appears to me that they are substantially different in kind from the claims of Ambook and Olympia. The very essence of the claims of Ambook and Olympia is payment of the allegedly fixed compensation.

There is a further reason why the claims of these proposed representatives are not typical of the classes they seek to represent. In this connection I return to the fact, referred to earlier, that none of the proposed representatives dealt with any of the advertising agencies who are defendants in this action. Presumably Ambook, Kings and Olympia seek to sue these agencies as parties who have conspired with the publisher defendants, and hold the agencies liable on that basis, despite the lack of actual dealings with these agencies.

I do not deny that this is *a type* of claim which may have validity, provided there is a sufficient factual showing, etc. But clearly the most obvious and significant type of claims against the agency defendants would be by those persons who had *dealt* with those firms. Such claims would, of course, raise questions relating very directly to those agencies—Were the clients "coerced" into dealing with those agencies? What were the transactions between the clients and those agencies regarding compensation? Were the media discounts used for compensation or was some other compensation arrangement negotiated?

In my view it would be utterly incongruous to permit this action to proceed as a class action against these four agency defendants, on the basis of representation by three advertisers who have never dealt with them.

I conclude, therefore, that the requirements of Rule 23(a)(3) and (4) are not met. Ambook, Kings and Olympia are not proper representatives. Moreover, when the types of claims are analyzed it is seen that the claims of the proposed representatives fail, to a substantial degree, to be typical. The result of this is

that proposed classes and subclasses are not sufficiently homogeneous to be treated as classes under Rule 23.

It should be noted that the failure to meet the requirements of Rule 23(a) totally invalidates this action as a class action. This is true regardless of what subdivision of Rule 23(b) the action might otherwise fall under.

### b. *Lack of Predominance of Common Issues*

Although I believe that the problems under Rule 23(a) sufficiently dispose of the *Ambook* class action motions, it is appropriate to discuss certain further problems which are raised by the requirements of 23(b).

The proposed second amended complaint suggests class action treatment under every one of the subdivisions of 23(b). But plaintiff's attorney has referred in his briefs only to subdivision (b)(2), relating to injunctive relief, and subdivision (b)(3), relating to actions where common questions of law and fact predominate.

I will now deal with the question of whether the proposed class damage claims in the *Ambook* action meet the requirements of Rule 23(b)(3).

Plaintiff asserts that the basic issues in the case relate to whether or not there is a conspiracy between the publishers and agencies to establish the alleged dual-rate structure, and that these issues are common to the class or classes and predominate over individual issues. Plaintiff further asserts that "the only colorable individual issue is quantum of damages" (Reply Memorandum filed June 12, 1973).

Plaintiff grossly underestimates the nature and difficulty of the individual issues.

A private right of action for damages under the antitrust laws requires proof of injury to the plaintiff's business or property. 15 U.S.C. § 15. The *fact* of injury or damage is an es-

sential element of proof, in addition to the *quantum* of damages. In the case of a conspiracy claim, recovery is not based on the conspiracy itself but on injury to the plaintiff produced by specific overt acts pursuant to the conspiracy. Winckler & Smith Citrus Products v. Sunkist Growers, Inc., 346 F.2d 1012, 1014 n.1 (9th Cir. 1965); Carswell Trucks, Inc. v. International Harvester Co., 334 F. Supp. 1238 (S.D.N.Y.1971).

The cases cited by plaintiff are not applicable. The present case does not involve price fixing in commodities or items such as salt, brass pipes, pharmaceuticals, gasoline, books, etc. See Philadelphia v. Morton Salt Co., 248 F.Supp. 506 (E.D.Pa.1965); Philadelphia Electric Co. v. Anaconda American Brass Co., 43 F.R.D. 452 (E.D.Pa.1968); In Re Antibiotic Antitrust Actions, 333 F. Supp. 278 (S.D.N.Y.1971); Philadelphia v. American Oil Co., 53 F.R.D. 45 (D.N. J.1971); Illinois v. Harper & Row Publishers, Inc., 301 F.Supp. 484 (N.D.Ill. 1969). In such cases the fact of injury and the quantum of damages may be able to be dealt with by some kind of general proof or formula.

■■■ Such treatment is not possible in the present case. Here we are dealing with services, not commodities. For advertisers dealing with agencies, the amount of service required and the amount of compensation and basis for compensation vary according to the individual situation. For advertisers dealing directly with the publications, it is still true that a service is involved, and there are individual variations in the service performed.

Even in an area where one might picture a fair amount of standardization—classified advertising—there are substantial variations in the services performed by advertising agencies depending on whether the client wishes lay-out work, schedule planning, follow-up checks, etc. For direct classified advertisers the newspapers may or may not render such services as extension of credit, submission of proof, and advice on such matters as placement and category. Moreover, the New York Times asserts that it has 184 different rate categories for classified advertising, and that the agency discount is but one feature of the system of charging for such advertising. There are obviously a wide range of individual situations which prevent the issues of injury and damage to be determined on any kind of general proof or formulae.

Plaintiff's oversimplification of the individual issues is further indicated if we examine the specific allegations in the complaint. It is alleged that as a result of the conspiracy the advertisers have been coerced into dealing with advertising agencies; they have been prevented from establishing their own internal advertising capabilities. It is also alleged that as a result of the conspiracy the compensation paid by advertisers to the agencies has been fixed to equal the so-called media commission or discount.

In the case of an advertiser who uses an agency, the question is whether he was coerced in some fashion into doing so, or whether his reasons for dealing with the agency were entirely apart from any element of coercion. There certainly cannot be anything approaching a presumption that advertisers use agencies because of coercion, nor can such a question be dealt with on anything but an individual basis.

In the case of advertisers who use agencies, there is the concomitant question of whether they have been prevented by the alleged conspiracy from establishing their own internal advertising capability. Again, this is a question depending on the facts in each instance. This issue cannot possibly be dealt with on a group basis.

In the case of advertisers who do not deal through agencies and who do not receive any discount from the publishers, the question is whether this amounts to an injury resulting from the

alleged conspiracy. Have they been prevented by the conspiracy from developing an in-house advertising capacity or have they refrained from doing so for their own economic reasons? Do they in fact perform the work of developing advertising, or do they have sufficient volume, so that they deserve a discount? Have they ever applied for one? Again, these are individual questions and cannot be handled on a group basis.

On the question of fixing compensation for advertising agency services, the record shows that there are substantial individual questions about what negotiations took place between advertiser and agency; what compensation has been paid and on what basis and for what services; and whether, if the media commission was made the basis for the compensation, this resulted from the conspiracy or resulted from the desire and economic need of the advertiser.

As already indicated, Ambook and the proposed intervenors seek to represent 5,500 damage claimants. Moreover, they demand jury trial of the claims. In my view the individual issues would predominate in the litigation and would make the action totally unworkable. Class action treatment has been denied where there are substantial individual issues about coercion of individual members of the class and about other matters affecting fact of injury and quantum of damages, not susceptible to some generally applicable proof. Abercrombie v. Lum's Inc., 345 F.Supp. 387 (S.D. Fla.1972); In Re 7-Eleven Franchise Antitrust Litigation, 1972 CCH Trade Cases ¶ 74,156 (N.D.Cal.1972); Lah v. Shell Oil Co., 50 F.R.D. 198 (S.D.Ohio 1970).

It is true that under Rule 23 there may be, when appropriate, a single trial of common issues and then separate trials of individual issues. See Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. den., 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766. But this assumes that the individual issues can be reasonably split off, and also assumes that the individual issues can be handled with some degree of expedition and efficiency.

I am confident that neither condition exists in the present case. In this case, the so-called common issues such as conspiracy should not be tried in the abstract in the absence of the flesh-and-blood claimants to show the alleged effects of the conspiracy. Also the trial of the individual issues on the 5,500 claims could not be conducted with anything approaching efficiency or expedition. See Harris v. Jones, 41 F.R.D. 70, 74 n.5 (D.Utah 1966) for a discussion of the difficulties in processing what were thought to be simple damage claims by 200 or so antitrust claimants, following the decision in Union Carbide v. Nisley, 300 F.2d 561 (10th Cir. 1961).

c. *Ambook Damage Claims Under Rule 23(b)(1)*

The proposed second amended complaint asserts that the action can be properly maintained under subdivisions (1)(A) and (1)(B) of Rule 23(b). But plaintiff has never briefed this contention. Extended discussion is unnecessary.

Subdivision (1)(A) provides for class actions where prosecution of separate actions by individual class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for the party opposing the class. Subdivision (1)(B) provides for class actions where adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of the other members.

There is no reason to believe that subdivisions (1).(A) and (1)(B) were intended to apply to collections of individual damage claims, connected only by common questions of law or fact, which are specifically provided for in subdivision (b)(3).

The Advisory Committee Notes offer examples of (1)(A) and (1)(B) actions, which make clear that these subdivisions were not intended for actions such as the *Ambook* case. These examples include actions to declare a municipal bond issue invalid, to declare the rights and duties of riparian owners, and to attack the financial reorganization of a fraternal association.

There is another and quite practical reason for not applying (1)(A) and (1)(B). These subdivisions assume a danger of other actions by individual class members. But for a conspiracy which has been allegedly going on since 1917, there has been a notable lack of litigation enthusiasm by the alleged members of the injured classes. To be sure, a few class champions have recently brought the three actions now before this court. But no other individual class members show any signs of taking action. In such a situation (1)(A) and (1)(B) should not be invoked. Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 564 (2d Cir. 1968).

### d. *Ambook Injunction Claims*

 Plaintiff claims that the action can at least proceed with respect to the "injunction class" under Rule 23(b)(2). As already indicated this class involves several hundred thousand persons. Plaintiff refers to the discussion at the end of the opinion in "Eisen III," Eisen v. Carlisle & Jacquelin, 479 F.2d 1005 (2d Cir. 1973), suggesting that, where class damage actions are not feasible, resort to injunctive relief may be considered as being "relatively simple and inexpensive." But obviously the Court of Appeals was not passing on the propriety of any specific injunction class action.

Upon my review of the circumstances of this case, I conclude that the injunction class claim should not be permitted. I have already held that the requirements of Rule 23(a) are not met, and

this, of course, applies to the injunction claim as well as to the damage claim.

It is equally true that the action fails to meet the conditions of Rule 23(b)(2). That subdivision applies where the party opposing the class has acted "on grounds generally applicable to the class," making injunctive relief appropriate "with respect to the class as a whole."

The circumstances of the members of the alleged injunction class are simply too disparate to find that there has been action by defendants, or any of them, "generally applicable to the class," or to contemplate entering a decree "with respect to the class as a whole." The so-called injunction class consists of advertisers who use agencies and those who do not; direct advertisers who deal through in-house organizations receiving a discount and direct advertisers who do not so deal; advertisers who compensate their agencies by the media commission and those who use a variety of other methods.

Moreover, to attempt to grant injunctive relief on a mass basis would violate the applicable provision of the antitrust laws. Clayton Act § 16, 15 U.S.C. § 26. This section provides that "any person" shall be entitled to sue for injunctive relief "as against threatened loss or damage by a violation of the antitrust laws." Thus the person suing must show that he is threatened with loss or damage. Thus "must be of a sort personal to the plaintiff." United States v. Borden Co., 347 U.S. 514, 518, 74 S.Ct. 703, 706, 98 L.Ed. 903 (1954).

The necessary showing under Clayton Act § 16 cannot be made for the "injunction class" proposed here, particularly in view of the disparities of individual situations which the record discloses.

### The Nabcor Action

#### Facts

This antitrust action was commenced December 10, 1970. The two plaintiffs

are National Auto Brokers Corp. ("Nabcor") and Nabcor of East New York ("Nabcor East").

Nabcor claims that it has developed a concept which permits it to sell cars to retail consumers at prices below what can be had from regular auto dealers. The theory is that Nabcor acts as agent for large numbers of retail customers in order to obtain discounts on volume purchasing. The intention is that the saving will be passed on, in part, to the consumer.

The action originally combined a claim based upon discriminatory advertising rates (Counts 9–13) with other antitrust claims. The advertising counts have now been severed from the rest of the action.

The complaint alleges that these counts are brought on behalf of all persons or entities of any kind placing advertising during the four years prior to commencement of the action *directly* with any newspaper in the United States, who have not been granted the discounts regularly granted to agencies. Named as defendants are The New York Times Company, Dow Jones & Company, New York News Company, Newsday, Inc., and The Westchester Rockland Newspapers, Inc.

The plaintiff class is described in the complaint as "several million direct advertisers." According to the complaint, the defendant publishers are sued on their own behalf and as representatives of a defendant class of "approximately 12,000 newspapers."

The complaint alleges violation of various sections of the antitrust laws. But the gravamen of the charges relates, as in *Ambook*, to the alleged dual rate system involving discounts to advertising agencies not granted to direct advertisers. In contrast to the *Ambook* action, the *Nabcor* action seeks to represent only *direct* advertisers who have not received the discounts. Treble damages, declaratory judgment and injunctive relief are sought.

Plaintiffs have moved for certification of this as a proper class action. At a hearing on the motion, I requested Nabcor's attorney to consider the question of manageability.

In an affidavit dated May 29, 1973 the attorney proposed to limit the claims as follows. The class claims would be asserted only against the newspapers of the named defendants—New York Times, New York Daily News, Wall Street Journal, Newsday and 10 papers published by Westchester Rockland. The proposal is to include 2,500 for the Times, 3,500 for the Daily News, 2,500 for the Wall Street Journal, 1,000 for Newsday and 500 for the Westchester Rockland papers. In each case these are to be the largest in dollar amount of direct advertisers during the years 1967–1970.

*Inappropriateness of Nabcor Class Action*

 From all indications, the task of culling out and calculating the 10,000 largest direct advertisers in these newspapers would be immense. The Wall Street Journal alone has 130 file drawers of invoices from which the information would have to be developed.

Aside from this there are problems with the proposed *Nabcor* class action, similar in some ways to those encountered in *Ambook*, which convince me that class action treatment should be denied.

I find that the requirements of Rule 23(a) are not met, in that the Nabcor plaintiffs are not adequate representatives, and in that there is not sufficient showing that their claims are typical of the claims of the 10,000 persons they wish to represent.

As already indicated, there are two plaintiffs—Nabcor and Nabcor East. I had occasion to obtain considerable information about the business and financial condition of Nabcor when Nabcor moved for a preliminary injunction in connection with the non-advertising portion of its antitrust case. At a hearing

before me on March 8, 1973 the president of Nabcor indicated that Nabcor was almost out of money and was in danger of going out of business. The president of Nabcor indicated that he had put $100,000 of his own money into the company, which was then almost gone.

On April 10, 1973, after two evidentiary hearings, I denied Nabcor's motion for preliminary injunction. The evidence showed that Nabcor's auto business was indeed almost defunct, although not for the reasons asserted in the preliminary injunction motion. I found that Nabcor was maintaining itself by some land speculation in the Poconos. But the overall condition of Nabcor, even with the land business, was bleak. Nabcor had a negative cash balance as of March 8, 1973. Moreover, I specifically found that the president of Nabcor had made serious misrepresentations regarding his financial transactions with Nabcor.

There is little information in the record about Nabcor East, except that it is one of Nabcor's brokers.

In my view, Nabcor and Nabcor East cannot possibly be considered as fit representatives for the class of 10,000 advertisers they propose to act for.

Moreover, there is no reason to believe that either Nabcor or Nabcor East would fall in any of the proposed groups of the largest direct advertisers in the various newspapers. For instance, during the four years 1967–70 Nabcor's total advertising in the New York Times amounted to $55.25, and Nabcor East's total advertising in the Times amounted to $154.60. Similar small amounts are involved with the other newspapers. The information in the record is sufficient to indicate that these amounts of advertising would place Nabcor well outside of the proposed groups of claimants. Certainly Nabcor and Nabcor East provide no basis for holding that they are *inside* such groups.

As to the question of whether Nabcor and Nabcor East have claims typical of those of the class, it must be said that the proposed class in this action is somewhat more homogeneous than in the *Ambook* action. It includes only direct advertisers.

But still it is difficult to see how these proposed 10,000 claimants can make up a single class. Five different newspaper companies are involved. Advertisers of completely different types would be included, with different volumes of advertising, and different demands for service. Different rate structures would be involved for different groups of advertisers.

For these reasons the *Nabcor* class claims do not comply with Rule 23(a). Similar considerations indicate that the requirements of Rule 23(b) are not met. Plaintiffs propose that their damage and declaratory judgment claims fall under (b)(1)(A) and (b)(3), and that their claim for injunctive relief falls under (b)(2). The considerations which caused me to deny the applicability of these provisions in *Ambook* apply here. The proposed two classes in the two cases are different, but the same basic problems exist.

### The Times Square Action

*Facts*

This action was commenced August 17, 1972. The plaintiffs are Ira Jay Sands and an entity called Times Square Associates, which is alleged to be a partnership, but is now probably a sole proprietorship. In any event it appears that Sands and Times Square own a building on 7th Avenue, New York City.

The defendants are New York Times Company, New York Post Corporation, Dow Jones Company (Wall Street Journal) and three advertising agencies— Newmark, Posner & Mitchell, Inc., Winer & Baum, Inc. and Cromwell Advertising, Inc.

The complaint alleges that suit is brought under Sherman Act § 1 for treble damages on behalf of all persons who have placed classified advertisements in the Times, the Post and the Wall Street Journal for business opportunities, the sale or leasing of real estate and employment of help. Only subdivision (b)(3) of Rule 23 is invoked. The complaint alleges a conspiracy to force advertisers to deal with agencies and to fix uniform rates for advertising charged by the newspapers and also uniform rates charged by agencies.

The proposed class would include both direct advertisers and those dealing through agencies.

In an affidavit dated May 31, 1973 plaintiffs' attorney proposed re-definition of the class. It would include all types of classified advertising, not limited to business opportunities, real estate and help wanted. But it would be limited to persons who have placed classified advertisements three or more times in the defendant newspapers from January 1, 1970 to August 14, 1972. The number is estimated to be 500,000.

*Inappropriateness of Times Square Class Action*

Defendants have argued strongly that Mr. Sands is an inadequate representative because of his conduct as an attorney in class actions in this court. See, e. g., Korn v. Franchard Corp., 1970 CCH Sec.L.Rep. ¶ 92,845 (S.D.N.Y. 1970). But see Korn v. Franchard Corp., 456 F.2d 1206, 1208 (2d Cir. 1972).

I feel, in fairness to Mr. Sands, that I do not have enough information to make a judgment as to his capacity, or lack of capacity, to act as a class representative here. I need not pursue the matter further, because class action treatment must be denied on other grounds.

Although the class in *Times Square* is limited to classified advertisers, this hardly eliminates the problems about disparity among class members which I found in *Ambook* and *Nabcor*.

Indeed the problems are intensified because we have a proposed class of 500,000 damage claimants, and included within that 500,000 would be advertisers in all the different positions discussed in connection with *Ambook*—agency clients versus direct advertisers, etc.

Moreover, the proposed class would include thousands of persons whose financial stake would be insignificant and as to whom notice-giving and the other necessary mechanics would either be meaningless or impossible. See Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, at 1015–1017 (2d Cir. 1973).

Although requested to do so, plaintiffs have not come forward with any indications that they would pay the cost of notice. This alone, under the *Eisen* decisions, would require dismissal of their class claims.

I should note that plaintiffs in *Times Square* have not stated that they, rather than members of the proposed class, have ever advertised in any of the three newspapers sued except the New York Times or have ever advertised with any of the three agencies sued except Cromwell Advertising Agency. The Wall Street Journal asserts that a search of its records shows no advertising by plaintiffs.

In this posture the record does not demonstrate plaintiffs' ability to act as class representatives against all three defendants.

*Conclusion*

As stated earlier, the motions to declare the *Ambook, Nabcor* and *Times Square* actions to be proper class actions are denied. The motion of Time Incorporated to declare the *Ambook* action *not* to be a proper class action is granted.

The motion of Kings Electronics and Olympia Theatre to intervene in the *Ambook* action is granted to the extent

that they are permitted to join that action and assert individual claims.

The motion to file the proposed second amended complaint in *Ambook* is denied, since that pleading contains improper class allegations. However, this is without prejudice to a motion to file a further pleading devoid of class action allegations.

Settle order.