Coye PETERSON et al.,
Plaintiffs-Appellants,

v.

The OKLAHOMA CITY HOUSING AUTHORITY, a Public Corporation and State Agency, et al., Defendants-Appellees.

No. 75–1617.

United States Court of Appeals,
Tenth Circuit.

Argued and Submitted May 19, 1976.

Decided Dec. 1, 1976.

Wesley G. Gibson, James H. Hiatt, and Stan L. Foster (The Legal Aid Society of Oklahoma County, Inc.), Oklahoma City, Okl., for plaintiffs-appellants.

William B. Rogers, Oklahoma City, Okl., for defendants-appellees.

Before BARRETT and DOYLE, Circuit Judges, and STANLEY, Senior District Judge *.

ARTHUR J. STANLEY, Jr., Senior District Judge.

The defendant-appellee, Oklahoma City Housing Authority, (the Authority) is a public corporation which manages and controls federally financed low-rent housing units in Oklahoma City.[1] Some of the residents are "general occupancy tenants" and some are "elderly tenants".

The plaintiffs-appellants (Tenants) are elderly occupants of units under leases which, prior to January 1, 1975, contained no provision for maintenance or security deposits. On December 18, 1974 the Governing Board

---

* Of the District of Kansas, sitting by designation.

1. The Oklahoma City Housing Authority is a local housing authority created by the State of Oklahoma by Title 63, Oklahoma Statutes, § 1051 et seq., to operate federally subsidized low-rent housing.

of the Authority adopted a resolution, effective January 1, 1975, providing for new leases containing a provision that all tenants be required to pay a deposit of $50.00, payable in lump sum or in installments of $5.00 or $10.00 per month.[2] By a memorandum to all tenants they were notified that at the termination of their tenancy the deposit would be refunded provided that "any charges left unpaid, or any damage to the unit (other than normal wear and tear) will be deducted from the maintenance deposit". By another resolution adopted by the Authority January 22, 1975, it was provided that the deposits be segregated and kept in an interest-bearing account, the earned interest to be used for tenant services or activities.

The Tenants brought this action, alleging that the deposit provision was applied to elderly residents without notice to them or an opportunity for them to comment; that its implementation would work a lasting and irreparable economic hardship upon them; that the elderly tenants do little or no damage; that imposition of a deposit requirement was arbitrary and capricious; that the amount of the deposit was excessive and unreasonable; that the Tenants' old lease was still in full force and effect; and that the payment of the deposit increased their rent to an amount violating the "Brooke Amendment". (42 U.S.C.A. § 1402). In an amendment to the complaint the issues were expanded to include allegations that the "new lease" and the deposit requirement was violative of Department of Housing and Urban Development Circulars; and that the Authority had violated the Tenants' due process rights by failing to provide them with adequate notice of the proposed changes in the new lease.

After an evidentiary hearing the trial court entered judgment for the defendants and found:

"1. That the maintenance deposit required by Defendants as a condition precedent to occupancy of Oklahoma City Housing Authority dwelling units is a valid returnable 'deposit' and is not in the nature of a 'rent'.

"2. That the maintenance deposit is neither excessive in amount nor discriminatory in its application.

"3. That those minimum standards for Housing Authority leases required by the Department of Housing and Urban Development are embodied in the lease to which Plaintiffs have objected.

"4. That tenants of the Oklahoma City Housing Authority were given adequate notice of proposed lease changes and adequate tenant grievance mechanisms have been established.

"5. That the imposition of said maintenance deposit does not arbitrarily or unreasonably deprive Defendants [sic] of their property.

"6. That imposition of said maintenance deposit is neither arbitrary, capricious, irrational, excessive nor unreasonable.

"7. That Clause 3.05 of said lease, pertaining to the maintenance deposit, is not so vague that a reasonable person of ordinary intelligence would not understand the rights and duties of the parties to the lease.

"8. That the Oklahoma City Housing Authority Board of Commissioners was a properly constituted body in accordance with Oklahoma law at

2. The Authority's action followed a letter from the Director of the Regional Office of the Department of Housing and Urban Development expressing concern with problems which should be corrected by the Authority and transmitting a survey report containing the following comment and recommendation "*DAMAGE DEPOSITS.* There is strong evidence that since the Authority has dropped its requirement for damage deposits, the cost of cleanup for a new tenant has increased. Since costs have not been accurately kept, this cannot be definitely proven; however, units that were inspected would indicate that this is true. *RECOMMENDATION*: We strongly suggest that damage deposits be reinstated as policy. In the event that this should work a hardship on the tenant, then a method of partial payments on a time basis could be adopted."

the time said maintenance deposit was approved.

"9. That named Plaintiffs failed to meet the burden of demonstrating requisite qualification to maintain their cause as a representative or class action as provided in Rule 23, of the Federal Rules of Civil Procedure. More specifically, the named Plaintiffs failed to show either that the elderly tenants of the Oklahoma City Housing Authority constituted a distinct class of persons for purposes of maintaining representative suit, that named Plaintiffs adequately represented the interests of such elderly tenants, that such tenants with whom named Plaintiffs might show an interest constituted a class so large as to make their joinder impractical, or that a class action would provide a superior method of adjudicating the controversy."

We turn to the trial court's determination that the action was not maintainable as a class action. The Tenants had moved to proceed as representatives of a class consisting of all elderly residents of public housing owned and operated by the Authority and all elderly persons who should subsequently be admitted to such housing. The trial court, after an evidentiary hearing, denied the motion and found that the Tenants did not meet the requirements of Rule 23(a), Fed.R.Civ.P., in that they had failed to show that the proposed class was so numerous that the joinder of all members was impracticable or that they would adequately protect the interests of the proposed class.

The Tenants argue that the action "represents a classic type of a Rule 23(b)(2) class action". Rule 23(b) does not stand alone. In order for an action to proceed as a class action it must meet all requirements of Rule 23(a) regardless of what subdivisions of Rule 23(b) it might otherwise fall under. *Tolbert v. Daniel Construction Co.*, 332 F.Supp. 772 (D.S.C.1971); *National Auto Brokers Corp. v. General Motors Corp.*, 60 F.R.D. 476, 489 (S.D.N.Y.1973).

The burden is upon plaintiffs seeking to represent a class to establish that the class is so numerous as to make joinder impracticable. *Williams v. Wohlgemuth*, 366 F.Supp. 541 (W.D.Pa.1973); *Tuma v. American Can Co.*, 367 F.Supp. 1178 (D.N.J.1973). Unless abuse is shown, the district court's determination is final. *Arkansas Educ. Ass'n. v. Board of Educ.*, 446 F.2d 763 (8th Cir. 1971); *Hill v. American Airlines, Inc.*, 479 F.2d 1057 (5th Cir. 1973). We have held that "the question of whether to allow a suit to proceed as a class action is one primarily for the determination of the trial judge. If he applies the correct criteria to the facts of the case, the decision should be considered to be within his discretion. *Gold Strike Stamp Co. v. Christensen*, 436 F.2d 791 (10th Cir. 1970); *Rossin v. Southern Union Gas Co.*, 472 F.2d 707 (10th Cir. 1973).

Here there was evidence that out of 830 public housing units occupied by elderly tenants, 811 had, without objection, executed the new leases requiring deposits, and that 794 had either paid or agreed to pay the deposit; that many of them had stated that they did not object to the requirements of the new lease and did not support the action, believing that the practice of requiring deposits would benefit them by encouraging better upkeep of neighboring units. The interest of these would be antagonistic to the interests of the plaintiffs-appellants. The record convinces us that the evidence before Judge Chandler supports his finding that the proposed class was overbroad and that the named plaintiffs failed to show that they could fairly and adequately protect the interests of residents who accepted the deposit requirement as beneficial to them and to like-minded elderly tenants. In our judgment the trial judge applied the correct criteria to the facts and did not abuse his discretion in determining that the case should not proceed as a class action.

The plaintiffs' principal attack is on the implementation of the Authority's resolution requiring the $50.00 deposit. They contend that the requirement that the Tenants make the deposit in addition to the payment of their rent amounts to an in-

crease in that rent in violation of 42 U.S. C.A. § 1402 (the Brooke Amendment) limiting rental to 25 percent of a tenant's monthly income.

■ Assuming that the sum of the rent and the security deposit exceeds 25 percent of the Tenants' income the question then is whether the payment of the maintenance deposit should be considered as additional rent. Rent is a compensation or income which the owner of land receives from a tenant for the use or occupation of the land. *United States Steel Corp. v. United States*, 270 F.Supp. 253 (S.D.N.Y.1967); *Gentry v. Bodan*, 347 F.Supp. 367 (W.D.La.1972). Upon the payment of rent the title to the money so paid passes to the landowner. Money deposited as security for the performance by a tenant of the conditions of his lease, here the obligation to pay the rent and to maintain the premises in good condition,[3] is in the nature of a trust fund with the tenant as beneficiary. See *In Re Pal-Playwell, Inc.*, 334 F.2d 389 (2d Cir. 1964).[4]

In their pleadings and briefs the Tenants refer to the required deposit variously as "maintenance and security deposit", "security deposit" and "maintenance and security deposit" and the Authority similarly uses the terms without distinction. In the resolution establishing the requirement for a deposit it is referred to as a "maintenance deposit", as it is in the "new lease" itself and in the Authority's resolution providing for segregation of the deposits in a separate account. The obligations and rights of the Tenants and the Authority are not fixed by the label used by the parties in the pleadings or briefs, in the resolutions, or even in the lease itself.

While in the letter which precipitated the Authority's action (Footnote 2) the Director of the Regional Office of HUD speaks of "damage deposits", his description of the deposit as one covering "the cost of clean-up for a new tenant" dictates that his letter can be read only as recommending that security deposits be required from the tenants.

Throughout the findings of the trial court the term "maintenance deposit" is used. This court has recognized and applied the well established appellate maxim that if a trial court's decision is correct upon any proper theory, it will be upheld. *Pound v. Insurance Co. of North America*, 439 F.2d 1059 (10th Cir. 1971); *Coleman v. Mountain Mesa Uranium Corp.*, 240 F.2d 12 (10th Cir. 1956); 10 Wright and Miller, Federal Practice and Procedure, § 2716, pp. 439–441.

If the deposit is truly a maintenance deposit, i. e., a sum of money to be expended by the landlord in its sole discretion for maintenance of the leased premises, the sums received would be additional rent. If, however, the deposit is security for the performance by each tenant of the conditions of his lease, kept with other such deposits in a separate account, and is returnable to him on termination of the tenancy if the conditions of the lease have been fulfilled by him, it is a security deposit.

■ Under the terms of the new lease the Tenants were obligated to pay the stipulated rent; to keep the leased unit in a tenantable, safe and sanitary condition; and, upon termination of the lease, to return possession of the unit to the Authority in as good condition as when leased to them, normal deterioration excepted. It is the performance of these duties that the

---

**3.** Section 3.02 of the "new lease" contains a provision that "the tenant shall not cause or permit any waste, damage or injury to the Dwelling Unit and shall keep and maintain the Dwelling Unit in a tenable, [sic] safe, and sanitary condition. *The cost of any damages deemed to be caused by the Tenant, his family and/or visitors will be charged to such Tenant and the Tenant shall pay the amount of said damages in full within fifteen (15) days from the date of the notice.* The Tenant shall, upon the termination of this Dwelling Lease return

possession of the Dwelling Unit to the Authority in as good and tenable [sic] condition as when leased to the Tenant, normal deterioration excepted."

**4.** While the court in *Pal-Playwell* dealt with a New York statute prohibiting the commingling of security deposits with other funds, we believe the holding to be in accordance with the general law where, as here, there is no such commingling of funds.

deposit secures. We hold that the deposits are security deposits, held by the Authority in trust for the benefit of the tenants, and that they do not constitute additional rent resulting in violation of 42 U.S.C.A. § 1402.

■ The amount of the required deposit is $50.00 for all tenants, general occupancy as well as elderly. The Tenants argue that the elderly residents are less destructive then general occupants and that as to them the amount of the deposit is arbitrary, capricious, irrational, excessive and unreasonable. The trial court found it to be neither excessive in amount nor discriminatory in application. The findings are supported by the evidence.

The applicable directive of HUD (Local Housing Authority Management Handbook) requires the Authority in fixing the amount of a security deposit, to consider the "average cost of renovating dwellings when tenants move out, normal wear and tear excepted". For the calendar year 1974 the average cost of restoring premises vacated by elderly tenants was $79.00. The Authority admits that this was less than the average cost of repairing tenant-caused damages to premises vacated by general occupancy tenants. It is, however, greater than the amount of the deposit required of all tenants and it may be assumed, under all the circumstances, that the Authority will not be able to recover from any tenant the amount by which the cost of restoration exceeds the amount of the deposit.

Some inequality is inherent in most aspects of the public housing program. The rental of comparable units varies from tenant to tenant according to ability to pay. It would be unrealistic to expect uniformity, or even a consistent pattern, in the cost of repairing tenant-caused damage. There will be disparity in the extent of such damage depending upon the size of the family occupying the premises and the ages of the children residing therein.

We find in the record no evidence to support the Tenants' claim that the amount of the deposit is arbitrary, oppressive, capricious, irrational or excessive.

■ The Tenants contend that the new lease does not comply in nine particulars with HUD Circulars 7468.8 and 7465.9 (Circulars 8 and 9), both effective at the time the "new lease" was implemented. The trial court found that the minimum standards required by HUD are embodied in the lease; that adequate notice of the proposed lease changes was given to the Tenants; and that adequate grievance procedures had been established (Findings 3 and 4). From our examination of the entire record we are satisfied that the trial court correctly found that the Authority had complied substantially with the minimum standards existing at the time of the adoption of the new lease.

■ The Tenants would have us remand this case "with instructions to the District Court to monitor the implementation by defendants of a lease which conforms to the HUD Regulations of 8–7–75". We decline the invitation. This case was tried January 30, 1975 and decided June 19, 1975 on the basis of the then existing rights and obligations of the parties. It is that decision which was appealed and that decision we have reviewed. We do not deem it proper to instruct the district court to assume general supervision of the future activities of the Authority nor will we anticipate violation by the Authority of applicable laws and regulations.

AFFIRMED.

WILLIAM E. DOYLE, Circuit Judge (dissenting).

I respectfully disagree with the majority opinion.

As to the substantive issues: I tend to agree that the alleged violations here fail to present a substantial case and, therefore, if the majority had come to grips along this line I would have concurred in it. Instead, however, the opinion proceeds at the outset to consider the sufficiency of the case as a class action and my objection goes to the dicta that is included under this heading. In my opinion it was unnecessary to consider whether the trial court erred in dis-

missing the class action, and I comment on the majority's discussion of the class action not only because it makes an unjustified attack on class actions generally but, also, its comments are not in accordance with the law. I recognize that no one is enamored with class actions and particularly no trial judge is. Still, this does not justify setting forth comments which are out of harmony with the rules and with court decisions.

I recognize that the requirements of both 23(a) and one of the subdivisions of 23(b) of the Federal Rules of Civil Procedure must be met, but I disagree that they have not been met here. First, the class is sufficiently numerous to justify having a class action. It numbers 830 members. The fact that 811 had executed new leases does not automatically eliminate them from the class. Joinder is obviously impractical with this large number.

There exists questions of law and fact which are common to the class. Each member has received the same treatment and any relief granted would be common to all the tenants.

The claims of the plaintiffs are typical of the class and it is not significant that many of the tenants possibly favor a security deposit. *See Herbst v. ITT Co.*, 495 F.2d 1308 (2d Cir. 1974), and *see also Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). After all, the claims need not be identical and the fact that certain of the tenants supported the imposition of a security deposit is not the answer. Fully recognizing the areas of trial court discretion, I submit that the existence of a class is not to be determined by the presence of some members of the group who have expressed opposition to a class action.

From all that is apparent, the representative parties fairly and adequately represent the interests of the class. Their attorney is qualified and the representative plaintiffs do not have interests which are antagonistic to the class.

Finally, I am not saying that this case should be pursued as a class action. I merely say that the analysis of its worth as a

class action is not correct. My preference would be to eliminate this part, thereby eliminating this dissent as well.