Lois FOSTER, on behalf of herself and all others similarly situated, Plaintiff,

v.

MERIT ENERGY COMPANY, et al., Defendant.

No. CIV–10–758–F.

United States District Court, W.D. Oklahoma.

May 14, 2012.

Allan Devore, Jandra S. Jorgenson, Devore & Jorgenson PLC, Patranell Britten Lewis, Robert N. Barnes, Barnes & Lewis LLP, Oklahoma City, OK, Angela C. Jones, Kerry W. Caywood, Park Nelson Caywood & Park, Chickasha, OK, for Plaintiff.

Christopher M. Kamper, Craig R. Carver, Carver Schwarz McNab & Bailey, Denver, CO, Glenn M. White, Karl F. Hirsch, Ryan J. Reaves, Mullins Hirsch & Jones PC, Oklahoma City, OK, for Defendant.

### MEMORANDUM OPINION AND ORDER ON PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

STEPHEN P. FRIOT, District Judge.

I. *Introduction*

Before the court is Plaintiff's Motion for Class Certification and Brief in Support, doc. no. 49. Defendant has responded to the motion, doc. no. 53, and plaintiff has filed a reply, doc. no. 58. In addition, the parties have filed various notices of supplemental authority, and the court has held a hearing on the motion for certification.

In this case, the plaintiff, Lois Foster, asserts that the defendant, Merit Energy Company, as lessee (successor to the original lessee), has violated her rights as a royalty owner under an oil and gas lease by unlawfully imposing on her royalty interest a share of gathering, compression and processing costs which she asserts should be borne entirely by the working interest. She asserts that Merit has accomplished this by selling raw natural gas to gas purchasers under "percentage of proceeds" (POP) contracts which have the effect of transferring to the royalty owner a portion of costs which she contends should be borne entirely by the working interest.

In addition to seeking her own recovery, plaintiff seeks relief on behalf of several thousand—she asserts nearly 15,000—royalty owners in Merit's Oklahoma wells.

Now that the matter has been exhaustively briefed and argued, the court makes its determination with respect to class certification. As is set forth in detail below, the court has concluded that plaintiff's motion for class certification must be denied.

II. *Class Certification Under Rule 23, Fed. R.Civ.P.*

█ The court possesses significant latitude in deciding whether or not to certify a class. *Vallario v. Vandehey*, 554 F.3d 1259,

1264 (10th Cir.2009). Rule 23(a) establishes four prerequisites to class treatment. Under Rule 23(a), the party seeking certification must demonstrate that:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

If the requirements of Rule 23(a) are satisfied, the proposed class must satisfy at least one of the three requirements listed in Rule 23(b).

■■■ Class action litigation is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only. *Wal–Mart Stores, Inc. v. Dukes,* — U.S. —, 131 S.Ct. 2541, 2550, 180 L.Ed.2d 374 (2011). In order to justify a departure from the general rule of individual litigation, a class representative must be part of the class and possess the same interest and suffer the same injury as the class members. *Id.*

■■■ It should also be borne in mind that "Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule . . . ." *Id.* at 2551. Certification is proper only if the court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied. *Id.* "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Id.*

As already noted, if the requirements of Rule 23(a) are met, plaintiff must then show that the case fits within one of the categories described in Rule 23(b). In this case, plaintiff seeks money damages. Consequently, subdivision (b)(3) of Rule 23 is the applicable subdivision. *Id.* at 2558. A Rule 23(b)(3) class may be maintained if:

the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed.R.Civ.P. 23(b)(3).

## A. *Rule 23(a) Requirements*

■■■ Before analyzing the Rule 23(a) prerequisites, the court must be satisfied that suit has been brought by "[o]ne or more members of [the] class." *Paton v. New Mexico Highlands University,* 275 F.3d 1274, 1278 (10th Cir.2002); *see also, Dukes,* 131 S.Ct. at 2550 (class representative must be part of the class). As a royalty owner in one of Merit's Oklahoma wells, plaintiff is clearly a member of the class she proposes to represent.

### 1. *Numerosity*

■■■ To satisfy this requirement, "[t]he burden is upon plaintiff[ ] seeking to represent a class to establish that the class is so numerous as to make joinder impracticable." *Peterson v. Oklahoma City Housing Authority,* 545 F.2d 1270, 1273 (10th Cir.1976). The Tenth Circuit has not adopted a particular number as presumptively sufficient to meet this burden and there is "no set formula to determine if the class is so numerous that it should be so certified." *Trevizo v. Adams,* 455 F.3d 1155, 1162 (10th Cir.2006) (quotation omitted). Plaintiff asserts that the proposed class has nearly 15,000 members. Doc. no. 49, at 10. Merit concedes that the numerosity requirement has been met, doc. no. 53, at 16, and the court agrees.

## 2. Commonality

 Even a single common question will satisfy the commonality requirement. *Dukes,* at 2556.[1] But as the court pointed out in *Dukes,* the commonality language of Rule 23(a) "is easy to misread, since '[a]ny competently crafted class complaint literally raises common 'questions.'" *Id.* at 2551.[2] The common contention which the plaintiff seeks to litigate on behalf of the proposed class "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* This is because:

> What matters to class certification ... is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers.

*Id.,* quoting from Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof,* 84 N.Y.U.L.Rev. 97, 132 (2009).

Bearing these basic principles in mind, the court will examine the claims and issues which plaintiff asserts are common to the proposed class.

Plaintiff's argument for commonality has two basic premises: (1) for royalty payment purposes, Merit treated all class members alike, regardless of lease language, and (2) under Oklahoma law, differences in lease language are irrelevant to a determination of whether Merit's uniform approach to payment of royalties violated the rights of the lessors.

For purposes of class certification, at least, Merit does not challenge the first premise.

As relevant to the issues now before the court, Merit treated all of the members of the proposed class alike. From that premise, plaintiff argues that: "The central issue in this suit—whether Merit has paid royalties in accordance with **Oklahoma** law—lends itself nicely to certification because Merit treats all Class Royalty owners the same way. As such, Merit's actions in paying royalty to the Class are **uniform** and can be judged on a class-wide basis." Doc. no. 49, at 9.

At some risk of oversimplification, it is fair to say that plaintiff's central assertion in this case is that Merit's payment of royalties on the basis of the price it receives under percentage-of-proceeds gas sale contracts, pursuant to which Merit sells raw gas to a midstream purchaser in return for a percentage of the proceeds received by the midstream purchaser, wrongfully burdens the royalty interest with a proportionate share of compression, transportation and processing costs which should be borne entirely by the working interest, as the cost bearing interest. Relying on Oklahoma case law, plaintiff argues that the lessee, as proprietor of the working interest, is obligated to put the raw gas in marketable form at its expense, and to pay royalties to the lessor on the basis of the value of commercially marketable (essentially interstate pipeline quality) gas.

On the basis of this central assertion, plaintiff asserts that this case presents the following common questions, suitable for adjudication on a classwide basis:

1. Common Question: Did the raw gas stream produced from the Class members' Wells require the expenditure of costs and expenses to make it marketable?

2. Common Question: Did Merit routinely deduct any costs and expenses, incurred before the products became

---

1. Plaintiff cites *Realmonte v. Reeves,* 169 F.3d 1280, 1285 (10th Cir.1999), for the proposition that the commonality element requires that there be but one issue "affecting all *or a significant number* of the proposed class members." Doc. no. 49, at 10 (emphasis added). Aside from the fact that *Realmonte* says no such thing, any notion that the concept of commonality contemplates that there is some leeway for a class action to proceed with some class members unaffected

by the adjudication of the claims prosecuted on behalf of the class is irreconcilable with the Court's holdings in *Dukes.*

2. Although *Dukes* is an employment discrimination case, the Court's discussion of the Rule 23(a) requirements in Part II of the opinion is clearly not limited to employment class actions.

commercially marketable, from payments that were due and owing to the Class member royalty owners—or, were there costs and expenses incurred after the product was marketable, so that Merit should be given the opportunity to meet its burden to prove that each fee charged was reasonable, enhanced value, and increased royalty revenue in proportion to the fee?

3. Common Question: Did Merit conduct a proper *Mittelstaedt* analysis?

4. Common Question: Is Merit justified in paying royalty on the net amount Merit receives AFTER deduction of fees under a "percent of proceeds" gas contract?

5. Common Question: Does the language of various leases change the deductions that can be made to the Class members' royalty payments?

6. Common Question: Did Merit violate 52 Okla. Stat. § 570.12 and its previous iterations § 568 and § 540?

7. Common Question: What is the applicable limitation period for the bringing of the Class Claims?

8. Common Question: Did Merit owe fiduciary and/or quasi-fiduciary obligations to the Class members?

9. Common Question: Did Merit use gas off the lease or in the manufacture of products without paying royalty due on that gas?

10. Common Question: Is Merit legally required to pay royalty on condensate (including "scrubber oil" and "drip gas") and, if so, did it violate that requirement?

11. Common Question: Is Merit liable to the Class for fraud, deceit, constructive fraud and fraudulent concealment?

12. Common Question: Is Merit liable to the Class for both breach of contract and tortious breach of contract?

13. Common Question: Is Merit liable to the Class for conversion?

14. Common Question: Is Merit liable to the Class on a conspiracy claim?

15. Common Question: Has Merit been unjustly enriched at the expense of royalty owners since the royalty owners are paid only on proceeds after service fees are deducted?

16. Common Question: Has Merit been unjustly enriched by its percent-of-proceeds (POP) contracts that allow a third party(ies) to pay the cost of creating a marketable product, in exchange for a percentage of the product?

17. Common Question: Is Merit liable to the Class for punitive damages?

Doc. no. 49, at 14–15 (record citations omitted).

Plaintiff's contention that Merit's payment of royalties on a uniform basis supports a finding of commonality is correct, but that is only the beginning point for the commonality analysis in this case. The determination of whether litigation of plaintiff's proposed common questions will "generate common *answers* apt to drive the resolution of the litigation" on a classwide basis, *Dukes* at 2551, requires an examination of the facts that will produce those answers and the law that will be applied to those facts.

As a result of radical changes in the business of natural gas production, processing and distribution in the last three decades, the Supreme Court of Oklahoma has been confronted with a series of cases in which it has been required to determine what decades-old lease language, augmented by long-recognized implied covenants, means in light of the new production, processing and distribution practices—new practices that developed, at least in part, in response to substantial changes in the regulatory environment.

The Court's resolution of the class certification issues, especially the commonality issue, requires some examination of the Supreme Court's royalty cases, because the court's ultimate determination of the issues that plaintiff seeks to litigate on a representative basis will turn largely, if not entirely, on the law of Oklahoma, to the extent that the law may be discerned from those cases.

The essential question, for present purposes, is whether plaintiff has presented a class consisting of claimants whose rights, as championed by Lois Foster, can be adjudicated "in one stroke" on the basis of Oklahoma law as found in the relevant Oklahoma cases and applied to the operative facts of Ms. Foster's claim.

Although there are royalty cases older and more recent than *Mittelstaedt v. Santa Fe Minerals, Inc.*, 954 P.2d 1203 (Okla.1998), that decision provides a good starting point for the court's determination of what matters are relevant to the adjudication of the claims of Ms. Foster and the members of the proposed class.

In *Mittelstaedt*, the Tenth Circuit certified the following question to the Oklahoma Supreme Court:

> In light of the facts as detailed below, is an oil and gas lessee who is obligated to pay "3/16 of the gross proceeds received for the gas sold" entitled to deduct a proportional share of transportation, compression, dehydration, and blending costs from the royalty interest paid to the lessor?

954 P.2d at 1204–05.

The Supreme Court concluded that:

> [T]his clause, when considered by itself, prohibits a lessee from deducting a proportionate share of transportation, compression, dehydration, and blending costs when ·such costs are associated with creating a marketable product. However, we conclude that the lessor must bear a proportionate share of such costs if the lessee can show (1) that the costs enhanced the value of an already marketable product, (2) that such costs are reasonable, and (3) that actual royalty revenues increased in proportion with the costs assessed against the nonworking interest. Thus, in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not.

*Id.* at 1205.

██ Because the *Mittelstaedt* case came to the Supreme Court on a certified question

from the Tenth Circuit, the Court's decision in *Mittelstaedt* expounded the law at considerable length, but left to the federal courts the application of the law to the facts of the case.[3] On the present motion for class certification, the court reviews the *Mittelstaedt* decision (and related decisions) not for the purpose of addressing the merits of plaintiff's claims, but for the purpose of determining what matters are relevant to the adjudication of a royalty owner's claim that the lessee has improperly charged costs against the royalty interest. The *Mittelstaedt* decision provides valuable guidance for this task. *Mittelstaedt* makes it clear that adjudication of a royalty owner claim is driven by a combination of (i) lease language, (ii) implied covenant law, and (iii) the facts as to the marketability and marketing of the gas produced from the well.

As an initial matter, it is noteworthy that the Supreme Court's expression of its holding is couched in terms of "this clause, when considered by itself." *Id.* at 1205. The royalty clause before the Court in *Mittelstaedt*, "considered by itself," precluded the allocation to the royalty interest of those costs associated with creating a marketable product. But then, depending on the outcome of the application of the three-part test articulated by the Court, "in some cases a royalty interest may be burdened with post-production costs, and in other cases it may not." *Id.* (The Court did not discuss the significance of the fact that the royalty clause before it did not contain language establishing a geographic point of valuation.) The facts as to marketing and marketability can be significant: As Professor Anderson has noted, in *Mittelstaedt*, "the court wisely retreated from the impression left in its prior opinions that marketability is to be determined as a matter of law." Owen L. Anderson, *Royalty Valuation: Should Royalty Obligations be Determined Intrinsically, Theoretically, or Realistically?*, 37 Nat. Resources J. 611, 693 (1997).[4] Having left

---

3. The *Mittelstaedt* case was settled a few months after the Supreme Court handed down its decision. *See, Mittelstaedt v. Santa Fe Minerals, Inc.,* CIV–92–529–R, W.D.Okla., doc. no. 145 (Aug. 14, 1998).

4. The Court handed down its decision in *Mittelstaedt* in 1998. Although Professor Anderson's article appears in an edition of *Natural Resources Journal* which bears a 1997 date, his comment

marketability to be determined as a question of fact, "the court did not attempt to define either the term 'marketable' or the term 'product.'" Byron C. Keeling and Karolyn K. Gillespie, *The First Marketable Product Doctrine: Just What is the "Product,"* 37 St. Mary's L.J. 1, at 65 (2005).

As for lease language, the *Mittelstaedt* decision makes it clear that lease language can make a difference. But, obviously, in answering the specific certified question before it, the Court had no occasion to determine the consequences that would flow from various other royalty clause formulations. The Court's discussion of its decisions in *Johnson v. Jernigan,* 475 P.2d 396 (Okla.1970), *Wood v. TXO Production Corp.,* 854 P.2d 880 (Okla. 1992) and *TXO Production Corp. v. State ex rel. Comm'rs of the Land Office,* 903 P.2d 259 (Okla.1994) makes it clear that lease language matters:

> In all these opinions [*Johnson, Wood* and *TXO* ] the Court had to fix the rights and duties of the parties *according to the language of the leases and the implied covenants that go with them.* The clause immediately *preceding the "gross proceeds" clause in our case is an in kind clause* requiring the lessee "To deliver to the credit of lessor free of cost, in the pipe line to which it may connect its wells, the 3/16 part of all oil . . . ." [footnote omitted] In [*TXO* ] we stated that the lease phrase "without cost into pipelines" modifying an "in kind" clause also referred to lessee's

1/8 payment of the market value of the gas sold to the lessor.

*Id.* at 1205–06 (emphasis added).[5]

■ And in this passage of its opinion in *Mittelstaedt,* the Court noted that "typical gas royalty clause types are 'market value,' 'proceeds' ('gross' and 'net') and 'in kind' clauses." *Id.* at 1206, n. 3 (citing *Tara Petroleum Corp. v. Hughey,* 630 P.2d 1269, 1272, n. 3 (Okla.1981)).[6] It is also evident from the Court's attention to terms like "gross" and "net" that the effect of those terms can vary:

> Consistent with this approach ["gross proceeds" precludes deductions], we have explained that when the lease requires payment of the "market value" of the gas this value "means the gas purchase contract price." [citation omitted]. But when certain circumstances are present this definition of "gross receipts," as being a value with no deductions, has been tied to the value of the product at a certain location, that is, the leased premises, or wellhead.

*Id.* at 1206.[7] Thus, in "certain circumstances," *Mittelstaedt* establishes that "gross receipts" can mean the value of the gas at the wellhead; that term precludes allocation of costs "only when the point of sale occurs at the leased premises." *Id.*

The decision in *Mittelstaedt* also makes it clear that marketing logistics can make as much difference as lease language:

> The Mittelstaedts argue that when the sale is at a distant market the implied duty of the lessee under the lease is to pay for all

---

on *Mittelstaedt* was apparently added just before publication.

**5.** *See also, Probst v. Ingram,* 373 P.2d 58, 62 (Okla.1962) ("[W]here the contracting parties so intend, the usual royalty provisions may be altered according to the desire of the parties.")

**6.** Lest there be any doubt as to the potential significance of lease language, it should be noted that, at other places in the *Mittelstaedt* opinion, the Court commented: "In [*TXO* ] we examined the language of the lease." *Mittelstaedt* at 1206. "The term 'gross proceeds' usually implies no deductions of any kind." *Id.* In *TXO,* "we concluded that the lessor did not pay certain postproduction costs *because of the language of the lease.*" *Id.* (emphasis added). Dehydration costs cannot be allocated to royalty "without provision for cost to lessors in the lease." *Id.* at 1209.

**7.** The Court also carefully scrutinized lease language in the *TXO* case: "Commissioners may choose, in lieu of actual production, the market value in cash of the first alternative. This is seen in the fact that the clause states that the lessee will 'pay to lessor the market value thereof.' The term 'thereof' refers to the one-eighth royalty of actual production. Since the in kind royalty is qualified by the 'without cost in to pipelines' clause, the market value royalty should likewise contain such qualification. In other words, when Commissioners elect to receive cash instead of actual production, they should receive the market value of the in-kind royalty which is one-eighths royalty of production without cost into pipelines." *TXO,* 903 P.2d at 261.

of those costs associated with delivering the gas at the point of sale, i.e., to get the product to the place of sale in marketable form at the expense of the lessee. This view is incorrect as to distant markets. We explained in [*TXO* ] that our ruling in *Johnson v. Jernigan,* 475 P.2d 396 (Okla. 1970) was still good, and that a lessor may be required to pay its proportionate share of transportation costs when the sale occurs off the lease premises. *See* [*TXO* ] at 262, 263 n. 2. In *Johnson* there was no market for the product at the leased premises. *Johnson* allows allocating transportation costs to lessors when the point of sale is away from the lease only when no market for the product is available at the lease. When there is a market available at the wellhead transportation costs to a point of sale at a distant market should not be allocated against the lessors' interest except in those circumstances that we will later explain.

*Id.* at 1207. The line between a market that is "distant" and one that is not is unclear. The Court did not discuss what effect variations in lease language might have on the "distant market" analysis, and, of course, had no occasion to discuss how the principles articulated in *Mittelstaedt* might apply to a POP contract.

■ If anything is clear from the Court's opinion in *Mittelstaedt,* it is that there are few all-embracing rules governing allocation of costs to royalty interests, at least once the gas has enough pressure behind it to get if off the lease: "Post-production costs must be examined on an individual basis to determine if they are within the class of costs shared by a royalty interest." *Id.* at 1208. There may well be a baseline rule that the producer has a duty to do what it takes, at its expense, to make the product marketable at the lease,[8] although even that proposition would likely yield to some of the lease language quoted below.[9] The Supreme Court's disinclination to impose a status-based legal regime on the relationship between the royalty owner and the producer is made plain by Justice Opala's dissent in *Mittelstaedt.* Although Justice Opala stopped short of saying that the language of a particular royalty clause is alto-

**8.** Beyond the lease line, the situation gets murkier. As for transportation, how distant is a "distant market"? *See, Mittelstaedt* at 1207 (commenting on the continued viability of *Johnson v. Jernigan,* 475 P.2d 396 (Okla.1970)). Even as to a matter as seemingly simple as transportation, the Supreme Court's pronouncements have evolved. In *TXO,* the Court described its holding in *Johnson* as requiring a lessor "to bear its proportionate share of transportation costs when the sale occurs off the lease premises." 903 P.2d at 263, n. 2. Simple enough. Then came *Mittelstaedt* four years later. Under *Mittelstaedt,* the chargeability of transportation costs is noticeably more complex—and far more fact-bound. *Mittelstaedt,* 954 P.2d at 1207. What, exactly, are the physical attributes of a product that is "marketable" in the sense required to qualify as an "already marketable product" so as to trigger possible cost sharing under the *Mittelstaedt* formulation? What, exactly, is the difference between "dehydration" (all on the lessee) and *"excess* dehydration to an already marketable product," *Mittelstaedt* at 1209, for purposes of the *Mittelstaedt* formulation? Does this differentiation imply that, contrary to plaintiff's contention, gas can be dehydrated to the extent necessary to qualify as "marketable" in the sense discussed in *Mittelstaedt,* but still not be of interstate pipeline quality? There may be, as this passage in *Mittelstaedt* would clearly suggest, a two-tiered concept of marketability for purposes of dehydration. Compare the Court's flat statement in

*TXO* (Under *Wood,* "costs for compression, dehydration and gathering are not chargeable to [royalty] because such processes are necessary to make the product marketable under the implied covenant to market." 903 P.2d at 263) with the *"excess* dehydration" discussion in *Mittelstaedt,* 954 P.2d at 1209. If so, is there also a two-tiered concept of marketability with respect to other species of processing or treatment costs? If so, how are those lines drawn? (In *TXO* and *Wood,* the processing in question took place on the leased premises—a fact favorable to the plaintiff royalty owners in those cases.)

**9.** In *Howell v. Texaco, Inc.,* 112 P.3d 1154 (Okla. 2004), the Supreme Court, commenting on its decision in *Mittelstaedt,* observed that it was *lease language* that precluded the allocation of costs to royalty: "In *Mittelstaedt,* the lease provided for royalty payments of '3/16 of the gross proceeds received for the gas sold.' *Id.* at ¶ 1, 954 P.2d at 1204. *The clause* prohibits a producer from deducting the costs of obtaining a marketable product." 112 P.3d at 1160 (emphasis added). As is discussed elsewhere in this order, the Supreme Court's royalty cases leave a considerable amount of uncertainty as to the relative roles played by lease language, on one hand, and the implied covenant to market, on the other, in bringing about the results reached in those cases.

gether irrelevant, he did argue against "pick[ing] apart the precise phraseology of each clause" and in favor of "examin[ing] the plain meaning of the *entire* contract." 954 P.2d at 1216–17.[10]

Against the backdrop of the Supreme Court's royalty decisions, the next step in the court's determination of whether plaintiff has satisfied the commonality requirement of Rule 23(a) is to look at the language of the leases that created the relationships between Merit and the unnamed class members.

An affidavit from Kevin Dickerson, Land Manager for Merit, is attached as Exhibit A to Merit's response to plaintiff's motion for class certification. Doc. no. 53–1, filed on August 10, 2011. Attached to Mr. Dickerson's affidavit is a table containing transcriptions of various royalty clauses in the leases under which the proposed class members are royalty owners. Mr. Dickerson states that Merit pays royalties in Oklahoma under ap-

proximately 3,387 leases.[11] In the interest of eliminating judgment calls to the extent possible, Mr. Dickerson appears to have applied a fairly strict standard in identifying variations in lease language. Thus, he has put in separate categories leases that may well not have legally material differences in the relevant language. For discussion purposes only, and freely acknowledging that the excerpts set forth below could be said to be overinclusive or underinclusive, the court has reproduced in the table below those portions of Mr. Dickerson's table which reflect potentially material variations in lease language. The first column in this partial reproduction of Mr. Dickerson's table shows the clause number assigned to the clause by Mr. Dickerson. The second column shows the number of leases, per Mr. Dickerson's count, having the language shown in the third column (italics in the third column have been added).[12]

| Clause | # N leases | Lease language |
| --- | --- | --- |
| 1 | 37 | 2nd . . . . (b) "To pay Lessor 1/8 of the gross proceeds each year, payable quarterly, for the gas from each well where gas only is found, while the same is being used off the premises, and if used in the manufacture of gasoline a royalty of 1/8 payable monthly at the prevailing market rate for gas." <br> 3rd. To pay lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of one-eighth (1/8) of the proceeds, at the mouth of the well, payable monthly at the prevailing market rate. |
| 2 | 9 | 2nd. To pay lessor for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products therefrom, one-eighth, at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom." |

**10.** The net effect of *Mittelstaedt, TXO, Wood,* and *Tara* is that the gold standard for a royalty owner's claim would be to have a low pressure well on a lease that (i) provides for payment of royalty on the basis of gross proceeds, (ii) has no geographic specifics ("at the mouth of the well"), (iii) no quality specifics ("raw gas") and (iv) is located either close to an interstate pipeline or distant from a pipeline but with a "market available at the wellhead," in the sense required by *Mittelstaedt,* 954 P.2d at 1207.

**11.** The proposed class includes all of Merit's Oklahoma royalty owners except, generally speaking, government agencies, publicly traded oil and gas companies and persons or entities that plaintiff's counsel is precluded, under ethical rules, from representing. Doc. no. 49, Ex. A, Slide 2. One of plaintiff's experts, Alyce Hoge, states that she has reviewed 2,705 leases "within the data provided by Merit." Doc. no. 49, Ex. E, p. 2. It is unclear whether the difference between

these two counts is the result of elimination of duplicates or is caused by other differences in the methods employed by Mr. Dickerson and Ms. Hoge in reviewing and analyzing a massive quantity of documents. That difference is of no moment to the court's Rule 23 analysis. Mr. Dickerson himself acknowledges, with a cogent and credible explanation, that the process of compiling leases and analyzing lease language "does not lend itself to being precise." Doc. no. 53–1, at 2. What is relevant to the task at hand is Mr. Dickerson's compilation of various forms of lease language. Although plaintiff asserts that differences in lease language are irrelevant, the accuracy of that compilation, as such, has not been challenged.

**12.** Some lease language appearing to be irrelevant for present purposes has been deleted from a few of the excerpts shown in this partial reproduction of Mr. Dickerson's table.

| | | |
|---|---|---|
| | | 3rd. To pay lessor for gas produced from any oil well and used off the premises, or for the manufacture of casing-head gasoline or dry commercial gas, .... of the proceeds, at the mouth of the well, at the prevailing market rate for the gas during which time such gas shall be used, said payments to be made monthly. |
| 3 | 188 | The lessee shall monthly pay lessor as royalty on gas marketed from each well where gas only is found, 1/8 of the proceeds if sold at the well, or if marketed by lessee off the leased premises, then 1/8 of its market value at the well. The lessee shall pay the lessor (a) 1/8 of the proceeds received by the lessee from the sale of casinghead gas produced from any oil well; (b) 1/8 of the value, at the mouth of the well, computed at the prevailing market price, of the casinghead gas, produced from any oil well and used by lessee off the leased premises for any purpose or used on the leased premises by the lessee for purposes other than the development and operation thereof. |
| 3(b) | 107 | The lessee shall pay the lessor: (a) if sold by lessee, one-eighth (1/8th) of the proceeds received by the lessee from the sale of gas, including casinghead gas produced from any well, or (b) If utilized by lessee, one-eighth (1/8) of the value at the mouth of the well, computed at the prevailing market price, of the gas, including casinghead gas produced from any well and used by lessee off the leased premises for any purpose, or used on the leased premises by the lessee for purposes other than the development and operation thereof. Such payments shall be received and accepted by lessor as full compensation for such gas, casinghead gas, gasoline or any by-products extracted or manufactured therefrom, as well as residue remaining after the extraction or manufacture of gasoline from such gas. |
| 6(a) | 6 | (b) on gas, including casinghead gas or other gaseous substances, produced from said land and sold, or used off the premises, or used for the extraction of gasoline or other products therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale ... |
| 11 | 299 | .... and where gas only is found one-eighth of the value of all raw gas at the mouth of the well, while said gas is being used or sold off the premises, payment for gas so used or sold to be made monthly. The lessor to have gas free of cost from any gas well on said premises for all stoves and all inside lights in the principal dwelling house on said land by making his own connections with the well at his own risk and expense. To pay lessor for gas produced from any oil well and used off the premises one eighth of the value of the raw gas at the mouth of the well, payment for the gas so used or sold to be made quarterly. |
| 202(d) | 233 | To pay Lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, ——% of the net proceeds realized by Lessee for the gas sold, used off the premises, or in the manufacture of products therefrom, such net proceeds to be less a proportionate part of the production, severance and other excise taxes and the cost incurred by Lessee in delivering, processing, compressing or otherwise making such gas merchantable, said payments to be made monthly. |
| 202(e) | 4 | 2nd. To pay lessor for gas of whatsoever nature or kind produced and sold or used off the premises, or used in the manufacture of any products therefrom, one-eighth at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom, provided that on gas sold at the well the royalty shall be 1/8 of the amount realized from such sale, said payments to be made monthly. |
| 202(f) | 3 | 2. To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises or used in the manufacture of products therefrom, ..... of the gross proceeds received for the gas sold, used off the premises or in the manufacture of products therefrom, but in no event more than .... of the actual amount received by the lessee, said payments to be made monthly. |
| 233 | 2 | (2) On gas, gas concentrate, gas distillate, casinghead gas and all other gases, including their constituent parts, produced from said land and sold or used off the lease premises or in the manufacture of gasoline or other products, lessee shall pay to lessor a sum equal to 1/8 of the gross proceeds received from the sale of |

such produced substances where the same is sold at the mouth of the well, or if not sold at the mouth of the well, then 1/8 of the market value thereof at the mouth of the well, but in no event more than 1/8 of the actual amount received by the lessee for the sale thereof.

| | | |
|---|---|---|
| 255 | 29 | (4) The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other product as royalty 1/8 of the market value of such gas at the mouth of the well; if said gas is sold by the lessee, then as royalty 1/8 of the proceeds of the sale thereof at the mouth of the well. The lessee shall pay lessor as royalty 1/8 of the proceeds from the sale of gas as such at the mouth of the well where gas only is found and where such gas is not sold or used, lessee shall pay or tender annually at the end of each yearly period during which such gas is not sold or used, as royalty, an amount equal to the delay rental provided in paragraph 5 hereof, and while said royalty is so paid or tendered this lease shall be held as a producing lease under paragraph 2 hereof . . . . |
| 257 | 37 | The royalties to be paid by lessee are: (b) on gas, including casinghead gas and all gaseous substances, produced from said land and sold or used off the premises or in the manufacture of gasoline or other products therefrom, the market value at the mouth of the well of 1/8 of the gas so sold or used, provided that on gas sold at the wells, the royalty shall be 1/8 of the amount realized from such sale; and (c) at any time . . . . If there is a gas well or wells on the above land and for purposes of this clause, the term "gas well" shall include wells capable of producing natural gas, condensate, distillate or any gaseous substance and wells classified as gas wells by any governmental authority . . . |
| 281 | 2 | 2nd. To pay lessor . . . . Dollars each year, in advance, for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for —— stoves and —— inside lights in the principal dwelling house on said land during the same by making —— own connections with the well at —— own risk and expense.<br>3rd. To pay lessor for gas produced from any oil well and used off the premises at the rate of . . . . . Dollars per year, for the time during which such gas shall be used, said payments to be made each . . . . . in advance. |
| 281(g) | 221 | 2nd. To pay lessor for gas from each well where gas only is found, the equal one-eighth (1/8) of the gross proceeds at the prevailing market rate, for all gas used off the premises, said payments to be made . . . . (quarterly) (monthly) and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the well at his own risk and expense.<br><br>3rd. To pay lessor for gas produced from any oil well and used off the premises, or for the manufacture of casing-head gasoline or dry commercial gas, one-eighth (1/8) of the proceeds, at the mouth of the well, at the prevailing market rate for the gas during which time such gas shall be used, said payments to be made . . . . (quarterly) (monthly). |
| 281(k) | 4 | 2nd. To pay the lessor one-eighth of the selling price of the gas at the well, payable quarterly, for the gas from each well where gas only is found, while the same is being used off the premises; and the lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time, lessor to make his own connections with the well at his own risk and expense.<br><br>3rd. To pay lessor for gas produced from any oil well and used in the manufacture of casinghead gasoline or sold off the premises, one-eighth of the selling price of such casinghead gas at the well, payable quarterly. |
| 281(*l*) | 42 | 2nd. To pay the lessor one-eighth, at the market price at the well for the gas so used, for the gas from each well where gas only is found, while the same is being used off the premises, and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time by making his own connections with the wells at his own risk and expense. |

**554**

3rd. To pay lessor for gas produced from any oil well and used off the premises or for the manufacture of casinghead gasoline, one-eighth, at the market price at the well for the gas so used, for the time during which such gas shall be used, said payments to be made monthly.

298 1

1. —— of all oil, including distillate or condensate and other liquid hydrocarbons, produced and moved from the leased premises, which shall be delivered to Lessor's credit into any pipe line which the well or wells, or any of Lessee's tanks, may be connected, all free of cost of production and delivery. All oil and condensate shall be measured in tanks situated on the leased premises and such tanks shall not adjoin other tanks measuring oil or condensate in which Lessor has no interest or has a different interest. No liquid meters shall be used without Lessor's consent. Until further notice from Lessor, Lessee may purchase any royalty oil in Lessee's possession, paying the market price prevailing in the field where produced on the date same is run or sold: or, if there is no posted price in the field, the posted average price for oil of like grade and gravity prevailing in the general area in which the leased premises are located.

2. —— of the value of all gas produced and saved or sold from the leased premises, delivered free of cost of production and delivery. Delivery is defined as made when the gas has been received by the first purchaser thereof. Value shall not be less than the market price then current for gas of like character and quality delivered to any other purchaser in that field.

3. —— of the value of all plant products, including residue gas, free of extraction and plant or other process costs, where gas from the leased premises is processed by Lessee or through an affiliated company, or by any other party in a plant or process in or adjacent to the field in which the leased premises are located, or through arrangement on a royalty basis by Lessee with any other party in a plant or process not in or adjacent to the field wherein the leased premises are located. In this last event Lessor shall be paid only its proportionate share of said royalty paid to Lessee.

4. In the situations covered by the preceding Paragraph 3, Lessor shall receive not less than . . . . of the value of all residue gas at a price not less than the then current market price for residue gas of like character and quality delivered to any other purchaser in or adjacent to the field where produced.

302 1

1st. To deliver to the credit of lessor, free of cost, in the pipe line to which he may connect his wells, the equal one-eight part of all oil produced and saved from the leased premises.

2nd To pay lessor 1/8 of the market value of the raw gas at the well for the gas from each well where gas only is found, while the same is being used off the premises and lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same by making their own connections with the well at their own risk and expense.

3rd. To pay lessor for gas produced from any oil well and used on or off the premises or in the manufacture of gasoline or any other product at the rate of a royalty of one-eighth (1–8) payable monthly at the prevailing market rate.

303 55

(b) on gas, including casinghead gas and all other gaseous or vaporous substances, produced from said land and sold or used off the premises, or in the manufacture of gasoline or in the extraction of sulphur or any other product, the net proceeds at the well of . . . . . of the gas so sold or used, such net proceeds to be the proceeds received by Lessee calculated at, or allocated back to, the well from which produced after allowance and deduction for a fair and reasonable charge for gathering, compressing and making merchantable such gas between the well-head and the point at which such gas is valued for the purpose of determining proceeds to Lessee; (c) on any substance produced, saved and sold and not subject to (a) or (b) . . . . . of the proceeds at the well. Notwithstanding any provisions hereof to the contrary, if the price of any mineral or substance upon which royalty is payable hereunder is regulated by any law or governmental agency, the market value or market price of such mineral or substance for the purpose of computing royalty hereunder shall not be in excess of the price Lessee may receive and retain.

305 15

4. Lessee shall monthly pay Lessor as royalty on gas marketed from each well where gas only is found (as well as on any other gas marketed as or with such gas), one-eighth of the proceeds if sold at the well, or if marketed by Lessee off the lease then one-eighth of its market value at the well;

5. Lessee shall pay Lessor for gas produced from any oil well, and processed on the lease or in the vicinity for gasoline or other products (as well as gas from combination wells which may be processed with such gas), one-eighth of the proceeds if sold at the well, or if so utilized by Lessee, one-eighth of its market value at the well.

307 4

(B) LESSEE shall pay LESSOR, as royalty, for gas produced from any well on leased premises and used or sold by LESSEE off leased premises, or used by LESSEE in the manufacture of gasoline or any other product, one-eighth (1/8) of the market value of said gas, as such, at the mouth of the well. If such gas is sold by LESSEE at the well, then LESSEE shall pay LESSOR, as royalty, one-eighth (1/8) of the net proceeds derived from such sale.

309 3

1st. To deliver to the credit of lessor, free of cost (including, but not necessarily limited to, any and all costs of transportation, marketing, compression and treatment for sale), in the pipe line to which lessee may connect its or his wells, the equal ..... part of all oil produced and saved from the leased premises.

2nd. To pay to lessor, as royalty for gas from each well where gas only is found, while the same is being sold or used off of the premises, —— of the market price at the wells of the amount so sold or used, and where such gas is not so sold or used, lessee shall pay to lessor $10.00/Acre/Year per annum as royalty from each of such wells and while such royalty is so paid such well shall be held to be a producing well under the above paragraph setting forth the primary term hereof. Lessor may have gas free of charge from any gas well on the leased premises for all stoves and inside lights in the principal dwelling house on said land during the time by making lessor's own connections with the well at lessor's own risk and expense.

310 2

2nd. To pay to lessor for gas produced and saved from leased premises: (a) if sold in its natural state on the leased premises where produced, one-eighth (1/8) of the proceeds received by lessee from the sale; and (b) on all other gas, one-eighth (1/8) of its market value at the well head. Lessor shall have, free of cost, gas from any dry gas well on the leased premises for use in the principal dwelling house on the leased premises by making his own connections with the well, and the installation, maintenance and use of the connections and gas shall be at lessor's own sole risk and expense.

315 2

Lessor shall receive royalties as follows, to wit:

(a) Twenty-five percent (25%) of the proceeds from a sale at the well, or if no such sale, of the market value, at the well, of all gas produced and saved from the lease acreage through a gas well or gas wells located upon said lease acreage, which shall be paid to the Lessor free of all cost and expense except taxes on production;

(b) Twenty-five percent (25%) of all condensate and distillate produced and saved from the lease acreage through a gas well or gas wells or through a gas distillate well or gas distillate wells located upon said lease acreage, which shall be delivered free of all cost and expense, except taxes on production, at the well or wells on said lease acreage or, at the Lessor's option, to the credit of the Lessor into the pipeline to which said well or wells may be connected;

(c) Twenty-five percent (25%) of all oil and other liquid hydrocarbons produced and saved from the lease acreage through an oil well or oil wells located upon said lease acreage, which shall be delivered free of all cost and expense, except taxes on production, at the well or wells on said lease acreage or, at the Lessor's option, to the credit of the Lessor into pipeline to which said well or wells may be connected; and,

(d) Twenty-five percent (25%) of the proceeds from a sale at the well, of all casinghead gas produced and saved from the lease acreage through an oil well or

oil wells located upon said lease acreage, which shall be paid to Lessor free of all cost and expense, except taxes on production.

4. The Lessee shall pay Lessor as royalty —— of the gross proceeds received by Lessee from the sale of gas in its natural state, whether said gas is produced from an oil well or a gas well.

5. The Lessee shall pay to Lessor for gas produced from any oil well or from any gas well and processed by Lessee in any plant on or off the leased premises:

a. . . . . . of the net proceeds received by Lessee from the sale of any and all natural gasoline, liquid hydrocarbons and other liquid products, sulphur, and other solid products extracted, absorbed, manufactured and saved.

b. . . . . . of the gross proceeds received by Lessee from the sale of residual dry gas remaining after such extracting, absorbing, manufacturing and saving.

6. The Lessee shall pay to Lessor for gas produced from any oil well or from any gas well and processed by a third party pursuant to a contract entered into by Lessee with a third party and in any plant on or off the leased premises:

a. . . . . . of the gross proceeds received by Lessee pursuant to any such third party contract from the sale of any and all natural gasoline, liquid hydrocarbons and other liquid products, sulphur or other solid products extracted, absorbed, manufactured and saved.

b. . . . . . of the gross proceeds received by Lessee from the sale under any such third party contract of any residual dry gas remaining after any such extracting, absorbing, manufacturing and saving.

c. . . . . . of the gross proceeds received by Lessee from the sale of residual natural gas redelivered unto Lessee pursuant to any such third party contract.

4. As royalty, Lessee shall deliver to the credit of Lessor, free of any cost (including, without limitation, costs of treating, compressing, marketing and/or transporting the products on or off the leased premises and other expenses of like nature) into the tanks or pipelines to which wells may be connected or to any other delivery point, —— of the proceeds from the sale of all the marketable substances which the Lessor owns to include oil, gas, gas condensate and other hydrocarbons produced and saved from the leased premises. Lessee shall pay Lessor royalty on all gas produced from a well on the leased premises or on lands pooled with the leased premises and sold or used off the leased premises regardless of whether or not such gas is produced to the credit of Lessee or sold under a contract executed by or binding on Lessee. Should gas be sold under a sales contract not binding on Lessor, Lessor's royalty will be calculated based on the highest price paid for any of the gas produced from the well from which such gas is produced. In no event will the price paid Lessor for Lessor's share of gas be less than the price paid Lessee for Lessee's share of gas.

1st. To deliver to the credit of lessor free of cost, in the pipe line to which it may connect its wells, or at the option on the lessor, to deliver to such pipe line as it may elect, the —— part of all oil (including but not limited to condensate and distillate) produced and saved from the leased premises.

2nd. To deliver to the credit of lessor, free of cost, into the pipe line to which the well or wells may be connected by lessee, or at the option of the lessor to such pipe line as it may direct, —— part of all gas, including its constituents, produced and saved from the leased premises

7. Lessee shall pay monthly to Lessor as royalty on gas marketed from each well one-eighth of the proceeds thereof, less one-eighth of Lessee's handling cost if said gas is marketed off the leased premises, provided, however, said royalty in no event shall be less than one-eighth of the market value of said gas at the mouth of the well. Lessee shall pay Lessor (a) one-eighth of the proceeds received by Lessee from the sale of all casinghead gas, (b) one-eighth of the value, at the mouth of the well, computed at the prevailing market price, of all casinghead gas used by Lessee off the leased premises or used on the leased

premises by Lessee for purposes other than the development and operation thereof.

| | | |
|---|---|---|
| 326 | 2 | (b) on gas (including casinghead gas) produced from said land and sold or used off the land or in the manufacture of gasoline or other product, the market value at the wells of one-eighth of the gas so sold or used provided that if and when lessee shall sell gas (including casinghead gas) at the wells lessor's royalty thereon shall be one-eighth of the amount realized from such sales . . . . |
| 327 | 1 | 2. Lessee agrees to pay the lessor at the rate of fully paid up in advance, for the gas from each well where gas only is found while the same is being used off the premises and the said lessor to have gas free of cost from any such well for all stoves and all inside lights in the principal dwelling house on said land during the same time, such gas to be delivered to lessor from and at the mouth of such well but shall be taken and used by lessor economically and at lessor's own risk and expense. This obligation on the part of the lessee to cease when the pressure may get too low to flow to said dwelling. |

Plaintiff contends that: "Regardless of lease language, certification of a putative class is proper." Doc. no. 49, at 19. Some respected judges have agreed. The undersigned judge disagrees.

The royalty clause in plaintiff's lease states, in its entirety, as follows:

> The lessee shall pay lessor, as royalty, one-eighth of the proceeds from the sale of the gas, as such, for gas from wells where gas only is found, and where not sold shall pay Fifty ($50.00) Dollars per annum as royalty from each such well, and while such royalty is so paid such well shall be held to be a producing well under paragraph numbered two hereof. The lessor to have gas free of charge from any gas well on the leased premises for stoves and inside lights in the principal dwelling house on said land by making his own connection with the well, the use of said gas to be at the lessor's sole risk and expense. The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other product, as royalty, one-eighth of the market value of such gas at the mouth of the well. If said gas is

sold by the lessee, then as royalty one-eighth of the proceeds of the sale thereof. Doc. no. 74, filed on April 13, 2012.

As can be seen, plaintiff's royalty clause specifies no geographic point of valuation for "gas, as such, for gas from wells where gas only is found." Gas produced from an "oil well" and *used* by the lessee as a feedstock has a geographic point of valuation—the mouth of the well.[13] Gas produced from an oil well, and sold, carries a royalty based on "the proceeds of the sale thereof."

With her lease in hand, Lois Foster seeks "adjudication by representation," *Amchem Prods. v. Windsor,* 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997), of the rights of royalty owners whose leases contain a remarkable variety of royalty provisions. To take only a few examples, some of those leases:

- Provide for payment on the basis of "gross proceeds," while plaintiff's does not.
- Provide for payment on the basis of "net proceeds," while plaintiff's does not.
- Require payment on the basis of "the market price at the well," while plaintiff's does not (other than for gas used by Merit as a feedstock).

13. Those geographic specifics can be significant, as indicated by the Supreme Court's opinion in *Teel v. Public Service Company of Oklahoma,* 767 P.2d 391 (Okla.1985), *superseded by statute on other grounds,* commenting on the significance of lease language in *Tara Petroleum Corp. v. Hughey,* 630 P.2d 1269 (Okla.1981): "*Tara* was specifically limited to a market price gas royalty clause—this is not the question before us. In *Tara* the lease contained a clause which provided that the lessee would pay the royalty interest *at* *the market price at the well.* None of the agreements between Teel and the operators contained this language." *Teel,* 767 P.2d at 398 (emphasis added). In the case at bar, as can be seen from the table set forth above at pp. 551–57, hundreds of the class members' leases provide for valuation "at the well" or "at the mouth of the well," whereas Ms. Foster's lease specifies a geographic point of valuation ("the mouth of the well") only for gas used as a feedstock.

- Require payment on the basis of "proceeds" as to gas sold at the well, and on the basis of "market value at the well" for gas "marketed by lessee off the leased premises."

- Treat gas and liquids the same; others do not.

- Provide for payment on the basis of "the value of all raw gas at the mouth of the well" for gas sold off the premises.[14]

- Provide for payment of a flat dollar amount per year (in advance) for gas, irrespective of volume.

- Provide for payment on the basis of net proceeds after allowance for charges for "gathering, compressing and making merchantable such gas between the wellhead and the point at which such gas is valued for the purpose of determining proceeds to Lessee."

- Require payment "free of any cost" for "compressing, marketing and/or transporting the products on or off the lease premises and other expenses of a like nature."

- Provide for payment of a 1/8th royalty, less 1/8th of "handling cost if said gas is marketed off the leased premises" but not less than 1/8 of the market value of the gas at the mouth of the well.

- Require payment on the basis of "gross proceeds" received "from the sale of gas in its natural state."

▆▆▆ Plaintiff argues that certification is appropriate because the implied covenant to market vitiates differences in lease language. Doc. no. 49, at 19, 25. The court takes for granted that, to some degree, the effect—and doubtless the intent—of the Supreme Court's royalty decisions has been to dampen or mitigate the effect of variations in lease language. That certainly makes sense. Any notion that a farmer signing a lease at his kitchen table—whether that occurred in 1930 or 1990—would have been cognizant of the niceties of royalty clause phraseology is wholly unrealistic. For that reason, oil and gas leases are construed in favor of the lessor, *Roye Realty & Developing, Inc. v. Watson*, 2 P.3d 320, 329 (Okla.1996), and other interpretive tools also help balance the scales. But what is equally clear from the Supreme Court's royalty cases is that lease language can and does make a difference. That general proposition is, in turn, confounded by the fact that in some of the Supreme Court's royalty cases, broad pronouncements are interspersed with references to specific lease language, with, in some instances, little or no indication of the extent to which the broad pronouncement is the product of the lease language then before the court, or, of equal importance, the extent to which the broad pronouncement might be rendered inapplicable by different lease language.

▆▆▆ Thus, although it may not take much by way of lease language to *give rise* to the implied covenant to market[15] (a covenant implied in fact, *see, Naylor v. Anadarko OGC Co.*, 2011 WL 7053782, at *2 (W.D.Okla. May 9, 2011), and cases there cited), there is little doubt that the contours of that covenant, the

---

**14.** Judge Russell has concluded that a royalty clause providing for payment on the basis of the value or "raw gas at the mouth of the well ... necessarily negates any intention by the parties to the lease that the lessee have any duty to put the gas in marketable form or to bear the costs of converting the raw gas into a marketable product." *Naylor v. Anadarko OGC Co.*, 2011 WL 7053782, at *3 (W.D.Okla. May 9, 2011). Judge Leonard disagrees with Judge Russell on this point. *Fankhouser v. XTO Energy, Inc.*, 2012 WL 601415, at *2 (W.D.Okla. Feb. 23, 2012). The fact that two veteran district judges in the same court disagree as to the dispositive effect of language that appears in some of the leases in the putative class (but not in others) brings into high relief the fact that there is what the Oklahoma Supreme Court has described in another context

as "litigious uncertainty," *Stump v. Cheek*, 179 P.3d 606, 613 (Okla.2007), with respect to these potentially dispositive differences in lease language. This undermines any contention that the commonality requirement has been satisfied.

**15.** *Cf., Fankhouser v. XTO Energy, Inc.*, 2012 WL 601415 (W.D.Okla. Feb. 23, 2012), where the defendant sought to categorically avoid the implied covenant to market as to some leases, arguing that the covenant was vitiated by lease language specifying the place at which the product was to be valued ("at the well") or the nature of the product on which the royalty was to be paid ("raw gas") or the allocation of expenses ("proceeds, less handling costs"). *Id.* at *2. Judge Leonard rejected this argument.

circumstances that will amount to a breach of the covenant, and the consequences of a breach, can and will be affected by lease language. As Judge Russell has concluded:

> Of course, the express language of a lease may wholly negative implication of a covenant by the lessee to market the gas produced and to bear the costs of putting the gas in a marketable form, *see Ashland Oil & Refining Co. v. Cities Service Gas Co.,* 462 F.2d 204, 213 n. 9 (10th Cir.1972) (implied covenant to market exists under a lease in the absence of an express provision negativing such an implication); *Rogers v. Heston Oil Co.,* 735 P.2d [542,] at 546 [ (Okla.1984) ] (covenant is part of lease only where its inclusion is not inconsistent with other lease terms).

*Id.* at *3.

 In addressing plaintiff's motion for class certification, the court need not address the merits of any of plaintiff's claims, although, even on a certification motion, that is sometimes appropriate. *Dukes,* at 2551. To the contrary, in determining whether the Rule 23(a) commonality requirement has been satisfied in the case at bar, it is necessary to look only for "litigious uncertainty," as discussed above, with respect to *potentially* material differences between the representative plaintiff's facts and the facts on which the claims of other members of the proposed class would stand or fall if their claims were adjudicated on *their* merits rather than, as required by Rule 23, on the merits of Lois Foster's claim.

As has been noted, plaintiff correctly asserts that Merit treats all Oklahoma royalty owners alike with respect to payment of royalties. That, on its face, appears to be a risky approach for Merit, because it is counterintuitive to suppose that a single method of royalty calculation would comply with every one of the royalty clauses governing Merit's Oklahoma leases. But the issue now before the court is whether the legality of Merit's treatment of its Oklahoma royalty owners may be adjudicated on a classwide basis. On the issue of commonality under Rule 23(a), uniform treatment of all royalty owners will not carry the day where that uniform treatment must be measured against, among other things, a remarkable variety of royalty clauses (to say nothing of marketing conditions—such as distance to an interstate pipeline—at numerous well sites). In this case, the rights of the unnamed class members plainly cannot be adjudicated "in one stroke." *Dukes* at 2551.[16]

 As the proposed class representative seeking adjudication by representation, if Lois Foster wins on an issue that is determined at the class certification stage to be a common issue, then all members of the class win. Her win will be their win; her loss will be their loss. Adjudication by representation is plainly impermissible where, as here, the proposed representative plaintiff has her own set of operative facts and the members of the class present a wide range of variations with respect to potentially dispositive

**16.** To take but one example, although plaintiff's royalty clause does not refer to either "gross" proceeds or "net" proceeds (the putative class in this case has both, but plaintiff has neither), a royalty owner who is entitled to be paid on the basis of gross proceeds clearly has a stronger claim to royalties measured by the midstream company's selling price where the POP contract has the effect of quantifying the cost of converting raw production into an interstate pipeline quality product. Yet, at the heart of plaintiff's class certification argument is the proposition that, for purposes of determining commonality under Rule 23(a) and predominance under Rule 23(b)(3), there is no material difference between the legal ramifications of "gross," as used in a royalty clause, and "net," as used in a royalty clause. ("Regardless of lease language, certification of a putative class is proper." Doc. no. 49, at 19.) Regardless of the use of *net,* regardless of whether the lease provides for royalty on the basis of the value of *raw gas,* and regardless of whether the lease provides for valuation *at the mouth of the well,* plaintiff's central contention on the merits is that, where a POP contract is in place, royalty must be paid on the basis of the price the finished product commands at the tailgate of a downstream processing plant. Plaintiff may be correct (the Supreme Court has declined to address the legal effect of arms-length POP contracts—*see,* Order Certifying State Law Questions to the Oklahoma Supreme Court, doc. no. 118, filed February 12, 2010 in *Hill v. Marathon Oil Company,* CIV–08–0037 (W.D.Okla.) (Question No. 3) and *Hill v. Marathon Oil Company,* No. 108,098 (Okla.Sup.Ct.), Order of May 11, 2010), but nothing in Oklahoma law as it may presently be ascertained tells us that differences in lease language may so facilely be disregarded.

facts.[17] And where, as in this case, the operative facts with respect to the unnamed class members are all over the lot, it is no answer to say, as plaintiff suggests, that differences among class members boil down to differences in damages. Doc. no. 49, at 24. It certainly is true that, after an adjudication of liability in favor of a properly certified class, the task of calculating individual damages would remain. No citation of authority is needed for the proposition that that would not preclude certification. But if (in disregard of the requirements of Rule 23) a class were certified in this case, an adjudication in favor of Lois Foster, on the language of *her* lease, viewed in the context of the physical and market-related facts as to *her* well, would merely set the stage for class member-by-class member determinations as to which class members should also be permitted to recover, on the basis of *their* facts. That would not be merely a reckoning of "differences in the amounts of damages due each royalty owner." *Id.*[18]

The court accordingly concludes that plaintiff has not satisfied the Rule 23(a) commonality requirement. Although other judges of

this court and other courts have concluded otherwise, the undersigned concurs with Chief Judge Miles–LaGrange:

> The Court finds that the varying terms of the hundreds of leases, relating to matters such as the method for calculating royalty, allowance for post-production charges or fuel use and affiliate sales demonstrate the inability to adjudicate the claims of the named plaintiff and expect the same result to apply to all members of the proposed class. The Court finds plaintiff has failed to identify issues of fact or law that are truly common to all persons included within the class definition, or to demonstrate that, if certification was granted, that this case could proceed as a class and reliably "generate common answers apt to drive the resolution of the litigation." *Dukes*, 131 S.Ct. at 2551.

*Tucker v. BP America Production Co.*, 278 F.R.D. 646, 654 (W.D.Okla.2011).[19] *See also*, to the same effect, *Morrison v. Anadarko Petroleum Corp.*, 280 F.R.D. 621 (W.D.Okla. 2012) (Miles–LaGrange, J.).

**17.** Plaintiff asserts, doc. no. 49, at 9, that "certification may be ... subdivided." If this is a reference to the possibility of the creation of subclasses, plaintiff is correct. "But [s]ubclasses are not a substitute for compliance with Rule 23." *Sprague v. General Motors Corp.*, 133 F.3d 388, 399, n. 9 (6th Cir.1998), *cert. denied*, 524 U.S. 923, 118 S.Ct. 2312, 141 L.Ed.2d 170 (1998). Subclasses, constituted on the basis of differences in potentially dispositive facts, could not be represented by Ms. Foster, whose claim must stand or fall on the basis of her own dispositive facts.

**18.** Although royalty cases have been tried to verdict, the more likely outcome would be a settlement—the fate of the vast majority of class actions. But "the legitimacy of the class action cannot rest simply upon all the practical good that a class settlement conceivably might accomplish." Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U.L.Rev. 97, 162 (2009). Class action proceedings in this case would essentially amount to an administrative process (even if the administrative phase were nominally preceded by an adjudication of sorts)—something akin to the "settlement only" approach to class action litigation which was circumscribed in *Amchem Products. Cf., Stirman v. Exxon Corp.*, 280 F.3d 554 (5th Cir.2002). In *Stirman*, the Fifth Circuit, commenting on the district court's approach to certification in a roy-

alty case, noted that: "Further, although it would be burdensome to determine if individual leases have express clauses negating the implied covenant to market, the district court found that, 'with the assistance of a special master, [this] is not an insurmountable challenge.'" *Id.* at 561. The Court of Appeals reversed the order certifying the class. The special master contemplated by the district court in *Stirman* would, in essence, have been tasked with adjudicating, piecemeal, the claims which, under Rule 23 and *Dukes*, must be susceptible of adjudication in one stroke on a representative basis.

**19.** For differing views, *see, e.g., Chieftain Royalty Co. v. QEP Energy Co.*, 281 F.R.D. 499 (W.D.Okla.2012) (Russell, J.); *Freebird, Inc. v. Merit Energy Co.*, 2011 WL 13638 (D.Kan. Jan. 4, 2011) (Vratil, J.); *Fankhouser v. XTO Energy, Inc.*, 2010 WL 5256807 (W.D.Okla. Dec. 16, 2010) (Leonard, J.); *Hill v. Kaiser–Francis Oil Co.*, 2010 WL 2474051 (W.D.Okla. June 9, 2010) (Russell, J.); *Naylor Farms, Inc. v. Anadarko OGC Co.*, 2009 WL 8572026 (W.D.Okla. Aug. 26, 2009) (Russell, J.); *Beer v. XTO Energy, Inc.*, 2009 WL 764500 (W.D.Okla. Mar. 20, 2009) (Leonard, J.); and *Anderson v. Merit Energy Co.*, 2008 WL 2484187 (D.Colo. June 19, 2008) (Babcock, J.). *Cf., Naylor Farms, Inc. v. Anadarko OGC Co.*, 2011 WL 7054449 (W.D.Okla. Nov. 3, 2011) (Russell, J.) (motion to decertify granted in part and denied in part).

### 3. *Typicality*

 Rule 23(a)(3) requires the claims of the named plaintiff to be typical of the claims of the class he seeks to represent. *DG ex rel. Stricklin v. Devaughn,* 594 F.3d 1188, 1198 (10th Cir.2010). The interests and claims of the named plaintiff and class members need not be identical to satisfy the requirement of typicality. *Id.* Provided the claims of the named plaintiff and class members are based on the same legal or remedial theory, differing fact situations of class members do not defeat typicality. *Id.* (citing *Adamson v. Bowen,* 855 F.2d 668, 676 (10th Cir.1988)). In that broad sense, Lois Foster's claims are typical of the claims of the class she proposed to represent. That typicality (*e.g.,* the fact that her legal theories are the same ones she would advance on behalf of the proposed class), gauged by that lenient standard, does nothing to remedy the other deficiencies in her arguments for class certification.

### 4. *Adequacy of representation*

Rule 23(a)(4) requires that "representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Tenth Circuit has identified two questions relevant to the adequacy requirement: "(1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Rutter & Wilbanks Corp. v. Shell Oil Co.,* 314 F.3d 1180, 1187–88 (10th Cir.2002) (quotation omitted).

 "The touchstones of due process in class actions have always been notice and adequacy of representation...." *In re Four Seasons Securities Laws Litigation,* 502 F.2d 834, 842 (10th Cir.1974). The determination of whether there is a conflict of interest must consequently be undertaken with the understanding that "a class representative must be part of the class and possess the same interest and suffer the same injury" as the class members. *East Tex. Motor Freight System Inc. v. Rodriguez,* 431 U.S. 395, 403, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977) (internal quotation omitted). "The inquiry into adequacy of representation, in particular, requires the district court's close scrutiny, because the purpose of Rule 23(a)(4) is to ensure due process for absent class members, who generally are bound by a judgment rendered in a class action." *Rattray v. Woodbury County,* 614 F.3d 831, 835 (8th Cir.2010) (citing *Hansberry v. Lee,* 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940)).

 Lois Foster's personal qualifications are impeccable, but it is unnecessary to look farther than the lease language quoted above to ascertain that she has a noticeably stronger case than some members of the proposed class and a weaker case than some others. Although adequacy of representation by the proposed representative does not require complete factual congruence, where, as here, absent class members would be exposed to an adverse judgment on the basis of facts materially weaker than their own individual facts, the proposed representative is not an adequate representative in the sense required by Rule 23(a)(4).[20]

## B. *Rule 23(b)(3) Requirements*

Plaintiff seeks to certify a class under Rule 23(b)(3), Fed.R.Civ.P., which requires plaintiff to show that the common issues will predominate over any individual issues and that a class action is a superior method for adjudicating the action. Rule 23(b)(3) points to the following factors when making this determination: "The class members' interests in individually controlling the prosecution ... of separate actions; ... the extent and nature of any litigation concerning the controversy already begun by ... class members; ... the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and ... the likely difficulties in managing a class action." Fed.R.Civ.P. 23(b)(3)(A)–(D).

### 1. *Predominance*

 The Rule 23(b)(3) predominance inquiry tests whether the proposed class is

---

20. Merit wisely foregoes any challenge to the qualifications and competence of proposed class counsel. Opposition to certification on that basis would be patently frivolous.

sufficiently cohesive to warrant adjudication by representation, a standard "far more demanding" than the commonality requirement of Rule 23(a). *Amchem Prods. v. Windsor,* 521 U.S. 591, 623–24, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). The predominance requirement requires more than a common claim; "issues common to the class must predominate over individual issues." *In re Hydrogen Peroxide Antitrust Lit.,* 552 F.3d 305, 311 (3rd Cir.2008); *accord, Monreal v. Potter,* 367 F.3d 1224, 1237–38 (10th Cir. 2004).

■■■ Although plaintiff relies heavily on the fact that Merit's royalty payment practices were uniform across the proposed class, that "shared experience," *Amchem,* 521 U.S. at 624, 117 S.Ct. 2231, cannot uncritically be found to satisfy the Rule 23(b)(3) predominance requirement because, "[g]iven the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about [Merit's uniform royalty payment practice] cannot satisfy the Rule 23(b)(3) predominance standard." *Id.*

■■■ Regardless of the theories of recovery that might be pursued, Ms. Foster's claims are perforce rooted in the royalty owner-producer relationship created by her lease. The contours of that relationship are established, in part, by the language of that lease. That unremarkable proposition is made clear by the attention paid by the Supreme Court to lease language in *Mittelstaedt* (lease language accorded a degree of significance which drew a dissent from Justice Opala), *TXO, Wood,* and *Tara,* among numerous other cases. None of plaintiff's theories, and none of the common questions she proposes (see pp. 546 and 547, above), can ripen into a right to recover damages or

other relief from Merit in the absence of a proven violation of the obligations arising from, and in part defined and limited by, the lease.[21] Even as to her proffered common questions that are couched in terms of liability (nos. 11–17, quoted above), plaintiff has made no discernable effort to unhitch these claims from the implied covenant to market. For that reason, plaintiff has given the court no basis upon which to conclude that these claims are free of the lease-specific issues that exist with respect to the questions she suggests are both common and predominant.

In sum, the court concludes that plaintiff has failed to establish the predominance requirement for certification of a class under Rule 23(b)(3).

### 2. *Superiority*

The second requirement for certification of a class under Rule 23(b)(3) is superiority. A Rule 23(b)(3) class action must be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3). Of the factors listed in Rule 23(b)(3)(A)–(D) as pertinent to the predominance and superiority findings, the court finds manageability is the principal concern in this case. There has been no showing in briefing or at the class certification hearing that class members have an interest in individually controlling the prosecution of separate actions. Fed.R.Civ.P. 23(b)(3)(A). The pendency of other actions is not a consideration—no such actions have been brought to the court's attention. Fed. R.Civ.P. 23(b)(3)(B). The third factor, the desirability of concentrating the litigation of the claims in one forum, weighs slightly in favor of class action treatment.

■■■ But the fourth factor—manageability—is a serious barrier to certification. The consideration of manageability "encompasses the whole range of practical problems

---

**21.** Some of plaintiff's proffered common questions are abstract questions of law (*e.g.* "Did Merit owe fiduciary and/or quasi fiduciary obligations to the Class Members?"). Some (*e.g.* "Is Merit liable to the Class for conversion?") are couched in terms of liability. Some suggest notably fact-bound issues (*e.g.* "Did Merit conduct a proper *Mittelstaedt* analysis?") But what matters is the "capacity of a classwide proceeding to generate common *answers* apt to drive the reso-

*lution of the litigation.* Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Dukes* at 2551 (second emphasis added). Thus, even if a question is arguably predominant, in the sense that it is generally relevant to the legal positions of the class members, that is of little or no moment if the question is not dispositive of some claim for relief.

that may render the class action format inappropriate for a particular suit." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 164, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Certifying a class with as many individual issues as are presented in this case will not "advance 'the efficiency and economy of litigation which is a principal purpose of the procedure.'" *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 159, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982), quoting *American Pipe & Construction Co. v. Utah,* 414 U.S. 538, 553, 94 S.Ct. 756, 38 L.Ed.2d 713 (1974). Consequently, the court concludes that the superiority requirement for certification of a class under Rule 23(b)(3) has not been satisfied.

### Conclusion

The court has concluded that the rights of 15,000 class members cannot, under Rule 23, be determined by adjudication of Lois Foster's claim. This conclusion is the result of factual variations among the members of the proposed class, as well as significant uncertainties in Oklahoma royalty law. Plaintiff's motion for class certification effectively asks the court, for the sake of class certification, "to conform the law to the proof," *McLaughlin v. Am. Tobacco Co.,* 522 F.3d 215, 220 (2d Cir.2008), *partially abrogated on other grounds* by *Bridge v. Phoenix Bond & Indem. Co.,* 553 U.S. 639, 128 S.Ct. 2131, 170 L.Ed.2d 1012 (2008), which the court is not empowered to do. Oklahoma royalty law may eventually render differences in lease language irrelevant. But the law is not there yet, and it may never get there. And the suggestion that the court should err on the side of certification, doc. no. 49 at 9, provides no warrant for entering a certification order that flies in the face of the requirements of Rule 23, as those requirements have been expounded by the Supreme Court of the United States and the Court of Appeals.

Plaintiff's Motion for Class Certification, doc. no. 49, is **DENIED.**